**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

A.E.S.E.., a minor child, and EUSEBIO DANIEL
SABILLON PAZ, her father,

        Plaintiffs,                             No. 2:21-cv-00569-SMV-GBW

    v.

THE UNITED STATES OF AMERICA and
MANAGEMENT & TRAINING CORPORATION,

        Defendants.

**DEFENDANT UNITED STATES OF AMERICA'S MOTION TO TRANSFER,
OR IN THE ALTERNATIVE, MOTION FOR PARTIAL DISMISSAL
<u>FOR LACK OF SUBJECT MATTER JURISDICTION</u>**

Defendant United States of America respectfully moves this Court to transfer this action to the Western District of Texas, or in the alternative, partial dismissal of this action pursuant to Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction. As discussed below, this case should be litigated in the Western District of Texas as Plaintiffs are domiciled in Texas and most of the acts complained of occurred there. In the alternative, Congress has not waived sovereign immunity for many of the claims asserted in this action. As such, those claims are jurisdictionally barred. Pursuant to D.N.M.LR-Civ. 7.1(a) counsel for Defendant United States of America has contacted counsel for Plaintiffs and counsel for Defendant Management & Training Corporation ("MTC"). This motion is opposed by Plaintiffs; MTC takes no position on the motion. This motion is based on the following memorandum of points and authorities and all matters of record.

1

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    OVERVIEW.

In May of 2018, Plaintiff Sabillon Paz unlawfully entered the United States with his minor child, Plaintiff A.E.S.E near the Paso Del Norte Processing Center in El Paso, Texas. The majority of Plaintiffs' claims against the United States stem from Plaintiffs' initial detention in El Paso, as well as Plaintiff A.E.S.E.'s claims related to her custody in Los Angeles, California. Plaintiff Sabillon Paz was detained, separated from A.E.S.E., and eventually granted a credible fear interview and dismissal of his unlawful entry charge. Following their separation, Plaintiff Sabillon Paz was transferred to the Otero County facility in Chapparal, New Mexico, which was operated by Defendant Management & Training Corporation ("MTC"). Plaintiff Sabillon Paz was later released and reunited with Plaintiff A.E.S.E. The two Plaintiffs bring this action under the Federal Tort Claims Act ("FTCA"), seeking monetary damages for alleged injuries caused by (1) Defendant's implementation of a policy to refer for prosecution all individuals suspected of illegally entering the United States at the United States–Mexico border, including parents traveling with children (referred to herein as the "Zero-Tolerance Policy"), and (2) the conditions of confinement and treatment of Plaintiffs after they were separated. Plaintiffs assert claims for intentional infliction of emotional distress and negligence. *See* Doc. 1 ("Complaint") ¶¶ 141-144 and 172-176.[1]

The United States has denounced the prior practice of separating children from their

---

[1] Plaintiffs' additional claims of Assault and Battery, Abuse of Process, Breach of Fiduciary Duty, Conversion, and Medical Negligence are not addressed by this motion.

families at the United States–Mexico border and "condemn[ed] the human tragedy" that occurred because of the Zero-Tolerance Policy. *Establishment of Interagency Task Force on the Reunification of Families*, Exec. Order 14,011, § 1, 86 Fed. Reg. 8273, 8273 (Feb. 5, 2021). The Biden Administration has committed the federal government to "protect family unity and ensure that children entering the United States are not separated from their families, except in the most extreme circumstances where a separation is clearly necessary for the safety and well-being of the child or is required by law." *Id.*

That said, the Court should not reach the merits of Plaintiffs' FTCA claims for two reasons. First, the Western District of Texas is the most appropriate forum for this litigation, and the Court should transfer this action to that District pursuant to 28 U.S.C. § 1404(a). Plaintiffs crossed the United States–Mexico border into the state of Texas; the Plaintiffs were separated in Texas; a substantial amount of the detention of Plaintiffs occurred in El Paso, Texas; and the complaints related to the care and alleged abuse that Plaintiff A.E.S.E received occurred in either Texas or California. The United States therefore respectfully requests that the Court transfer this action to the Western District of Texas for all further proceedings, for the convenience of the parties and witnesses, and in the interest of justice.

If the Court determines not to transfer the case, Defendant United States of America respectfully requests that Plaintiffs' claims of intentional infliction of emotional distress and negligence (the "Subject Claims") be dismissed for lack of subject-matter jurisdiction. Plaintiffs' alleged injuries resulting from the Subject Claims are not compensable under the FTCA because Congress has not waived the federal government's sovereign immunity

for claims for money damages in these circumstances. Although the United States recognizes that district courts adjudicating FTCA claims arising out of the Zero-Tolerance Policy have reached differing conclusions on the threshold jurisdictional arguments presented in this motion to dismiss, the United States respectfully submits that on the better reading of the law, Congress has not waived sovereign immunity and Plaintiffs may not recover under the FTCA for the Subject Claims.

## II.   FACTUAL AND LEGAL BACKGROUND.

### A.   Statutory framework for noncitizens[2] entering the United States.

Noncitizens who arrive in the United States, including those who arrive between ports of entry, are considered "applicant[s] for admission" and are required to be "inspected by immigration officers" to determine their admissibility to the United States. 8 U.S.C. §§ 1225(a)(1), (a)(3), (b).  When a noncitizen enters the United States between official ports of entry, he or she may be prosecuted for criminal immigration violations, including entering the United States "at any time or place other than as designated by immigration officers" and eluding "examination or inspection by immigration officers." 8 U.S.C § 1325(a). Section 1325(a) is a misdemeanor that is punishable by a fine and 'imprison[ment] not more than 6 months" for a first infraction. *Id*. A subsequent violation may result in imprisonment of not more than two years.  *Id.* Reentering the United States without authorization after having been previously removed is a felony. 8 U.S.C. § 1326. An

---

[2] This brief uses the term "noncitizen" as equivalent to the statutory term "alien." *See Barton v. Barr*, 140 S. Ct. 1442, 1446 n.2 (2020) (quoting 8 U.S.C. § 1101(a)(3)).

individual who reenters the United States without authorization after having been removed "shall be fined under title 18, or imprisoned not more than 2 years, or both." *Id.,* § 1326(a).

Individuals arriving in or present in the United States who are deemed inadmissible, are subject to removal from the United States and, as appropriate, detention pending such removal. *See id*. §§ 1225(b); 1226; 1357. These provisions apply to both adults and their accompanying children. Detention of noncitizens with final order of removal, including reinstated orders of removal, is governed by 8 U.S.C. § 1231(a). It authorizes detention in two circumstances. "During the removal period," the Attorney General "shall" detain the individual. *Id.* § 1231(a)(2). "[B]eyond the removal period," the Attorney General "may" continue to detain certain individuals specified in the statute or release them under an order of supervision. *Id.* § 1231(a)(3). The removal period specified in § 1231(a)(1)(A) lasts 90 days, and begins on the latest of the following: (1) the date the order of removal becomes administratively final; (2) if the removal order is judicially reviewed, and if a court orders a stay of the removal of the individual, the date of the court's final order; or (3) if the noncitizen is detained or confined (except under an immigration process), the date the individual is released from detention or confinement. *Id.* § 1231(A)(1)(B). The federal government possesses statutory authority to "arrange for appropriate places of detention for aliens detained pending removal or a decision on removal." *Id.* § 1231(g)(1). In some cases, the Department of Homeland Security ("DHS") may exercise its discretion to release a noncitizen from custody pending a decision on removal. *See, e.g.*, 8 U.S.C. §§ 1182(d)(5), 1226(a)(2).

**B.     Statutory    framework    for    immigration    custody    relating    to    unaccompanied minors.**

Federal immigration law authorizes the United States to provide for the custody and care of minor unaccompanied children who are present in the United States without lawful immigration status. Specifically, the Department of Health and Human Services' ("HHS'") Office of Refugee Resettlement ("ORR") is charged with "the care and placement of unaccompanied alien children who are in federal custody by reason of their immigration status." 6 U.S.C. §§ 279(a), (b)(1)(A), (b)(1)(C); *see also* 8 U.S.C. § 1232(b)(1). The term "unaccompanied alien child" or "UAC" is defined as a child who: (1) "has no lawful immigration status in the United States"; (2) "has not attained 18 years of age"; and (3) "with respect to whom . . . there is no parent or legal guardian in the United States [or] no parent or legal guardian in the United States is available to provide care and physical custody." 6 U.S.C. § 279(g)(2).

Under the Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), "[e]xcept in the case of exceptional circumstances, any department or agency . . . shall transfer the custody of such child to [ORR] not later than 72 hours after determining that such child is an unaccompanied alien child." 8 U.S.C. § 1232(b)(3). ORR seeks to place UACs "in the least restrictive setting that is in the best interest of the child." *Id.* § 1232(c)(2)(A). However, ORR "shall not release such children upon their own recognizance." 6 U.S.C. § 279(b)(2)(B). Rather, once in ORR custody, there are detailed statutory and regulatory provisions that must be followed before the child is released to an approved sponsor. *See* 8 U.S.C. § 1232(c)(3). Congress requires that "an unaccompanied

alien child may not be placed with a person . . . unless the Secretary of Health and Human Services makes a determination that the proposed custodian is capable of providing for the child's physical and mental well-being" and that "[s]uch determination shall, at a minimum, include verification of the custodian's identity and relationship to the child, if any, as well as an independent finding that the individual has not engaged in any activity that would indicate a potential risk to the child." *Id.* § 1232(c)(3)(A). In some instances, a home study is required. *Id.* § 1232(c)(3)(B).

### C.    Flores Agreement requirements.

In 1996, the federal government entered into a settlement agreement referred to as the "Flores Agreement." *See, e.g.*, *Flores v. Sessions*, No. 85-cv-4544 (C.D. Cal. Feb. 2, 2015) (ECF No. 101). The Flores Agreement "sets out nationwide policy for the detention, release, and treatment of minors in the custody of the [immigration authorities]." *Flores v. Lynch*, 828 F.3d 898, 901 (9th Cir. 2016) (citing Flores Agreement ¶ 9). Under a binding interpretation of the Ninth Circuit, the Flores Agreement "unambiguously" applies both to unaccompanied minors and to minors who are encountered together with their parents or legal guardians. *Id.* at 901. Under the Flores Agreement, the government must expeditiously transfer any minor who cannot be released from custody to a non-secure, licensed facility. *Id.* at 902-03 (quoting Flores Agreement ¶ 12)). The government must also "make and record the prompt and continuous efforts on its part toward . . . release of the minor." *Flores v. Rosen*, 984 F.3d 720, 738 (9th Cir. 2020) (quoting Flores Agreement ¶ 14).

Notably, the Flores Agreement applies only to minors. *Flores*, 828 F.3d at 901. It "does not address . . . the housing of family units and the scope of parental rights for adults apprehended with their children[,]" and it "does not contemplate releasing a child to a parent who remains in custody, because that would not be a 'release.'" *Flores*, 828 F.3d at 906; *see also United States v. Dominguez-Portillo*, No. 17-MJ-4409, 2018 WL 315759, at *9 (W.D. Tex. Jan. 5, 2018) ("[*Flores*] does not provide that parents are entitled to care for their children if they were simultaneously arrested by immigration authorities[.]"). Nor does the Flores Agreement provide any rights to adult detainees, including any rights of release. *Flores*, 828 F.3d at 908; *see also Dominguez-Portillo*, 2018 WL 315759, at *14-15; *Bunikyte v. Chertoff*, No. 07-164, 2007 WL 1074070, at *16 (W.D. Tex. Apr. 9, 2007). Although the Flores Agreement gives preference to release of minors to a parent, this preference "does not mean that the government must also make a parent available; it simply means that, if available, a parent is the first choice." *Flores*, 828 F.3d at 908.

### D.   Executive Branch directives regarding immigration enforcement.

During the time period relevant to this action, the Executive Branch issued several directives regarding enforcement of federal immigration laws. First, in January 2017, the former President issued Executive Order 13767 § 1, 82 Fed. Reg. 8793 (Jan. 30, 2017) ("EO 13767"), stating that "[i]t is the policy of the executive branch to . . . detain individuals apprehended on suspicion of violating Federal or State law, including Federal immigration law, pending further proceedings regarding those violations[.]" *Id*. § 2(b). Executive Order 13767 directed DHS to "ensure the detention of aliens apprehended for

violations of immigration law pending the outcome of their removal proceedings or their removal from the country to the extent permitted by law," *id*. § 6, and to exercise its parole authority "only on a case-by-case basis in accordance with the plain language of the statute . . . and in all circumstances only when an individual demonstrates urgent humanitarian reasons or a significant public benefit derived from such parole." *Id*. § 11(d).

Second, on April 11, 2017, DOJ issued guidance to all federal prosecutors regarding a renewed commitment to criminal immigration enforcement and directed that federal law enforcement prioritize the prosecution of several immigration offenses, including illegal entry under 8 U.S.C. § 1325 and illegal reentry of individuals who had been removed previously. *See* U.S. DOJ Memorandum on Renewed Commitment to Criminal Immigration Enforcement (April 11, 2017), available at https://www.justice.gov/opa/press-release/file/956841/download.

Third, on April 6, 2018, the former Attorney General issued a "Memorandum for Federal Prosecutors along the Southwest Border." U.S. DOJ News Release: Attorney General Announces Zero-Tolerance Policy for Criminal Illegal Entry (April 6, 2018), DOJ 18-417, 2018 WL 1666622 (the "Zero-Tolerance Memorandum"). The memorandum directed federal prosecutors along the United States–Mexico border "to the extent practicable, and in consultation with DHS, to adopt immediately a zero-tolerance policy for all offenses referred for prosecution under section 1325(a)." *Id*. Consistent with EO 13767 and the April 2018 Zero-Tolerance Memorandum, DHS began to refer for prosecution increased numbers of adults – including those traveling with children – who unlawfully entered the United States along the Southwest border in violation of Section

1325. *See generally* EO 13767. Minor children of those adults were transferred to ORR

custody as required by the TVPRA.

### E.     Detention and Release of Plaintiff Sabillon Paz

According to the Complaint, Plaintiffs are a father and daughter from Honduras who

illegally crossed the United States–Mexico Border in May 2018. Doc. 1, ¶¶ 28-29. Shortly

after crossing, they were apprehended by U.S. Customs and Border Protection ("CBP")

Border Patrol agents and transported to a station for processing and holding. *See id.* ¶ 30,

33. The father, Plaintiff Sabillon Paz was referred for prosecution for violating 8 U.S.C.

§ 1325 (illegal entry) and was transferred to criminal custody for approximately three

weeks. *Id.*, ¶¶ 46-47. According to the Complaint, the charges against Plaintiff Sabillon

Paz were dismissed on June 21, 2018, at which point he was transferred to the custody of

Immigration and Customs Enforcement. *Id.*, ¶¶ 48, 52.  Plaintiffs allege that, near the end

of June 2018, Plaintiff Sabillon Paz was informed that he had demonstrated a credible fear

of persecution in his home country and thus would be considered for asylum.  *Id.*, ¶ 72.

Upon Plaintiff Sabillon Paz's transfer to criminal custody, he was no longer

available to provide care and physical custody for his daughter. Plaintiff A.E.S.E. was

designated an unaccompanied minor and transferred to the Clint Border Facility in Clint,

Texas. *Id.,* ¶ 79. Plaintiffs allege that Plaintiff Sabillon Paz's parents (Plaintiff A.E.S.E.'s

grandparents) filed a Family Reunification Application with ORR on June 8, 2018, but that

they were never granted custody of A.E.S.E. *Id.,* ¶ ¶ 87-89. Plaintiffs further allege that in

early June 2018, Plaintiff A.E.S.E. was transferred to the David & Margaret Youth and

Family Services facility in Los Angeles, California, then ultimately released along with her father in El Paso, Texas on July 19, 2018. *Id.,* ¶¶ 90-92.

### F.      Plaintiffs' complaint.

Plaintiffs bring this action against the United States under the FTCA, 28 U.S.C. §§ 1346(b)(1), 2671-2680, seeking damages for intentional infliction of emotional distress (Count I) and negligence (Count VI), among other claims. *See* Doc. 1, ¶¶ 141-144 and 172-176. Plaintiffs allege that these harms stemmed from (1) the prosecution of Plaintiff Sabillon Paz. under the Zero-Tolerance Policy, which resulted in his separation from Plaintiff A.E.S.E, and (2) the conditions of confinement and treatment of Plaintiffs after they were separated.

As to Subject Claims based on the treatment of Plaintiffs while in custody, Plaintiffs allege that CBP officers detained them in an "icebox" or "*heilera*," so called because of its "freezing cold temperatures," *id.,* ¶ 34, and that their holding area was "crowded, dirty, [and] unhygienic." *Id.,* ¶ 35.  They also allege that when A.E.S.E. was in ORR custody, she was "given a small, windowless room to share with another girl about her age," that and that the room contained "no books or toys…[.]" *Id.* ¶¶ 93-95. Plaintiffs further allege that government officials limited calls between Plaintiff A.E.S.E and her parents during the time she was separated from her father. *Id.,* ¶¶ 99-100.

### G.      Subsequent policy changes.

After assuming office, President Biden took action to repudiate the policies that led to Plaintiffs' separation and to reunify the families that were affected by those policies. On

February 2, 2021, the President issued an Executive Order that condemned the "human tragedy" of the prior Administration's Zero-Tolerance Policy, and that committed the United States government to "protect family unity and ensure that children entering the United States are not separated from their families, except in the most extreme circumstances where a separation is clearly necessary for the safety and well-being of the child or is required by law." Family Reunification Task Force EO § 1. That Order created a Task Force to identify and reunify families separated under the Zero-Tolerance Policy, and to make recommendations for the potential provision of immigration benefits and mental-health services to those separated families. *Id.* § 4; *see also* Interim Progress Report, Interagency Task Force on the Reunification of Families 3, Nov. 29, 2021, available at https://www.dhs.gov/sites/default/files/publications/21_1129_s1_interim-progress-report-family-reunification-task-force.pdf.

## III.   LEGAL STANDARDS.

### A.   Transfer Under 28 U.S.C. § 1404(a).

The FTCA provides an avenue for individuals to sue the federal government for conduct that constitutes a tort under state law. The applicable substantive state law is "the law of the place where the act or omission occurred."  28 U.S.C. § 1346(b)(1). Venue for an FTCA claim is governed by 28 U.S.C. § 1402(b), which permits such a claim to be prosecuted "in the judicial district where the claimant resides or where the act or omission occurred."  28 U.S.C. § 1402(b).

However, section 1404(a) of Title 28 of the United States Code provides for transfer

to another district court:

> For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented.

*See also Atlantic Marine Const. Co., Inc. v. U.S. Dist. Court for Western District of Texas*, 571 U.S. 49, 62-63 (2013). A district court's analysis under Section 1404(a) considers "both private factors, which go to the convenience of the parties and witnesses, and public factors which go to the interests of justice." *Presidential Hospitality, LLC v. Wyndham Hotel Group, LLC,* 333 F.Supp.3d 1179, 1207 (D.N.M. 2018) citing *Research Automation, Inc. v. Schrader-Bridgeport Int'l, Inc.*, 626 F.3d 973, 977 (7th Cir. 2010) (internal quotation omitted). In undertaking this analysis, courts in the Tenth Circuit weigh and consider various case-specific, discretionary factors, including:

> the plaintiff's choice of forum; the accessibility of witnesses and other sources of proof, including the availability of compulsory process to insure attendance of witnesses; the cost of making the necessary proof; questions as to the enforceability of a judgement if one is obtained; relative advantages and obstacles to a fair trial; difficulties that may arise from congested dockets; the possibility of the existence of questions arising in the are of conflict of laws; the advantage of having a local court determine questions of local law; and, all other considerations of a practical nature that make a trial easy, expeditious and economical.

*Presidential Hospitality, LLC,* 333 F.Supp.3d. at 1207 (citing *Employers Mut. Cas. Co. v. Bartile Roofs, Inc.,* 618 F. 3d 1153, 1167 (10th Cir. 2010)). The moving party bears the burden of establishing that the proposed transfer is appropriate. *Chrysler Credit Corp. v. Chrysler, Inc.,* 928 F.2d 1509, 1515 (10th Cir. 1991) (internal citations omitted).

## B.    Dismissal for Lack of Subject Matter Jurisdiction.

A defendant may move to dismiss a complaint for lack of subject matter jurisdiction

under Federal Rule of Civil Procedure 12(b)(1). *See Baker v. USD 229 Blue Valley,* 979 F.3d 866, 872. Courts must consider the threshold issue of jurisdiction before addressing the merits of a case. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998). Plaintiffs bear the burden of establishing jurisdiction because, by filing a complaint in federal court, they seek to invoke it. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).

A party may move to dismiss claim for lack of subject matter jurisdiction under Rule 12(b)(1), "mounting either a facial or factual attack." *Baker,* 979 F.3d 866. The Court may dismiss an action under Rule 12(b)(1) if the complaint does not allege facts sufficient to establish subject matter jurisdiction on its face or, even if the complaint asserts grounds for jurisdiction on its face, the evidence does not support a finding of jurisdiction. *Thornhill Publishing Co. v. Gen. Tel. & Elec. Corp.,* 594 F.2d 730, 733 (9th Cir. 1979). A facial attack "asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction." *Baker,* 979 F. 3d 866, 872 (citing *Pueblo of Jemez v. United States,* 790 F.3d 1143, 1148, n.4 (10th Cir. 2015)). A factual challenge allows the court to look beyond the complaint without "presum[ing] the truthfulness of the plaintiff's allegations." *Id. citing Holt v. United States,* 46 F.3d 1000, 1003 (10th Cir. 1995). The Court also can hear evidence outside the pleadings and resolve factual disputes, if necessary, without treating the motion as one for summary judgment. *See Davis ex re. Davis v. U.S.,* 343 F.3d 1282, 1296 (10th Cir. 2003). Once the Court's jurisdiction is challenged, "the plaintiff has the burden of proving jurisdiction exists." *Wenz v. Memery Crystal,* 55 F.3d 1503, 1505 (10th Cir. 1995). Whether a facial or factual attack, because

14

"[f]ederal courts . . . have only that power that is authorized by Article III of the Constitution and the statutes enacted by Congress," *Bender v. Williamsport Area School Dist.*, 475 U.S. 534, 541 (1986) (citation omitted), the Court presumes the action lies outside its limited jurisdiction, and the burden is on the party asserting jurisdiction to establish that it exists. *Kokkonen,* 511 U.S. at 377.

A district court cannot hear a suit against the United States unless the government has waived sovereign immunity. *F.D.I.C. v. Meyer*, 510 U.S. 471, 475 (1994). "Sovereign immunity is jurisdictional in nature," meaning that a party's failure to establish a waiver of sovereign immunity is properly resolved on a motion to dismiss for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1). *Normandy Apartments, Ltd. v. U.S. Dept. of Housing and Urban Development,* 554 F.3d 1290, 1295 (10th Cir. 2009).

## IV. THE COURT SHOULD TRANSFER THIS ACTION TO THE WESTERN DISTRICT OF TEXAS.

The United States moves to transfer this case to the Western District of Texas "[f]or the convenience of parties and witnesses, [and] in the interest of justice." 28 U.S.C. § 1404(a). Both steps of the § 1404(a) analysis ae satisfied because (1) the Western District of Texas is the appropriate forum for this dispute and (2) the balance of the considerations favors litigating this action in that venue. Accordingly, this Court need not consider the merits of Plaintiffs' allegations and should instead transfer the case to the Western District of Texas for further proceedings there.

### A. Venue is Proper in the Western District of Texas.

Section 1404(a) permits transfer to any district where the case "might have been

brought." 28 U.S.C. § 1404(a). Pursuant to 28 U.S.C. § 1402(b), venue is proper in the Western District of Texas, where the majority of the allegedly tortious acts or omissions occurred. In their Complaint, Plaintiffs' only allegation specifically addressing venue is that "[a] substantial portion of the acts and omissions giving rise to the claims occurred in this district." Doc. 1, ¶ 13. But Plaintiffs also allege that they "are domiciled in Texas." *Id.,* ¶ 16. And nearly all of their specific allegations—from their initial separation, to Plaintiff Sabillon Paz's criminal detention, to Plaintiff A.E.S.E.'s initial detention in ORR custody—occurred in Texas.

Nor would transfer to the Western District of Texas preclude jurisdiction over any defendant.  Defendant MTC is headquartered in Utah. *See id.,* ¶ 18; *see also* Doc. 6, ¶ 18. Defendant MTC will be subject to the jurisdiction of Texas as it operates several facilities and has established its regional office in that state. *See, e.g.,* https://www.mtctrains.com/about-us/. In addition to establishing operations "so continuous and systematic" in the state of Texas as to render [it] essentially at home" in Texas and subject to its general jurisdiction, *see Daimler AG v. Bauman,* 517 U.S. 117, 138 (2014), Defendant MTC also contracted with the government to accept transferred detainees such as Plaintiff Sabillon Paz who had been apprehended in Texas to its facility in Chapparal, New Mexico near the El Paso – Ciudad Juarez border. The instant litigation arises directly from MTC's contacts with Texas and the migrants who were initially detained there, providing sufficient minimum contacts to warrant the exercise of specific jurisdiction over Defendant MTC in Texas. *See Presidential Hospitality, LLC,* 333 F.Supp.3d 1179, 1202 citing *Bristol Myers, Squibb Co. v. Superior Court of California,*

*San Francisco Cty*, 137 S.Ct. 1773, 1780 (2017) ("For a court to exercise specific jurisdiction the suit must arise of or relate to the defendant's contacts with the forum.") (Citations and quotations omitted.)

**B.      The Remaining Considerations Weigh In Favor of Transfer.**

Turning to the remaining considerations from the Tenth Circuit, Plaintiffs' "choice of forum weighs against the transfer"; however, their forum choice "receives less deference…if the plaintiff[s] do[] not reside in the district." *Employers Mut. Cas. Co.,* 618 F.3d at 1168 (citations omitted). In this case, Plaintiffs are domiciled in Texas, Doc. 1, ¶ 16, further supporting the transfer the litigation to that state. And nearly all of the acts of which they complain occurred either in Texas or in California.  By contrast, very few of the allegedly tortious acts or omissions occurred within this District: Plaintiffs allege that Plaintiff Sabillon Paz was abused and mistreated, and that he received inadequate medical care at the Otero facility in Chaparral, New Mexico. *Id.,* ¶¶ 59-78. There is therefore little concern that the parties will be deprived of access to witnesses or sources of proof if the case is moved to El Paso, Texas – a distance less than 30 miles from Chapparal, New Mexico.[3]  *See Employers Mut. Cas. Co.,* 618 F.3d at 1169. Similarly, the "cost of making necessary proof" is likely reduced if the case is litigated in El Paso instead of Albuquerque. *See id.* The remaining factors – difficulties that may arise from congested dockets, conflict of laws, and the advantage of having a local court determine questions of local law – are either neutral or argue in favor of transfer, as most of the acts complained of are alleged to

---

[3] Chaparral, New Mexico is approximately 35 miles from Las Cruces, New Mexico.

have occurred in Texas and would likely be governed by Texas law. *See id.*

On balance, these factors weigh in favor of transfer. Plaintiffs' choice of forum should only be given minimal weight because only a small portion of the alleged conduct occurred in New Mexico and they are not domiciled here. Therefore, Defendant requests that the Court transfer this matter to the Western District of Texas.

## V.   PLAINTIFFS' CLAIMS RELATED TO SEPARATION AND CONDITIONS OF DETENTION ARE JURISDICTIONALLY BARRED.

Should the Court decline to transfer the case, for the reasons set forth below, certain of Plaintiffs' claims should be dismissed for lack of jurisdiction. The government does not defend the merits of the policy choices at issue in this case, which have now been repudiated. Indeed, President Biden has condemned the "human tragedy" that resulted from the Zero-Tolerance Policy and committed not to repeat that tragedy. Family Reunification Task Force EO § 1. But this case does not concern the wisdom of those now-revoked policies. Instead, it is a personal injury suit for damages under the FTCA. Plaintiffs cannot prevail on their FTCA claims because this Court lacks subject-matter jurisdiction under established legal principles.

### A.   The claims are barred by the discretionary function exception.

#### 1.   Legal standard for discretionary function exception.

The United States, as a sovereign entity, is immune from suit except insofar as it has specifically and expressly consented to be sued. *Lehman v. Nakshian*, 453 U.S. 156, 160-61 (1981) (quoting *United States v. Testan*, 424 U.S. 392, 399 (1976)). "[T]he terms of [the government's] consent to be sued in any court define that court's jurisdiction to

entertain the suit." *Lehman*, 453 U.S. at 160 (internal quotes and citations omitted). Absent a specific, express waiver, sovereign immunity bars a suit against the government for lack of subject matter jurisdiction. *See FDIC v. Meyer*, 510 U.S. 471, 475-76 (1994).

"The FTCA constitutes a limited waiver of the federal government's sovereign immunity from private suit." *Estate of Trentadue ex rel. Aguilar v. United States,* 397 F.3d 840, 852 (10th Cir. 2005). The statute allows individuals to sue the United States when a federal employee's conduct, within the scope of his or her employment, causes "injury, loss of property, or personal injury or death." 28 U.S.C. § 1346(b)(1). However, the FTCA's waiver of sovereign immunity is subject to exceptions. *See* 28 U.S.C. § 2680.

When an exception applies, the United States retains its sovereign immunity, the court lacks jurisdiction, and the claim must be dismissed. *See Nurse v. United States*, 226 F.3d 996, 1000 (9th Cir. 2000). One such exception – the "discretionary function exception" ("DFE") – bars "[a]ny claim" that is "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a); *see also Gaubert v. United States*, 499 U.S. 315, 325 (1991); *Berkovitz v. United States*, 486 U.S. 531, 536 (1988).

The Supreme Court has set forth a two-part test to determine if the DFE applies. *United States v. Gaubert*, 499 U.S. at 328-32. Courts must first ask whether the challenged conduct was in fact "discretionary in nature" – that is, whether the conduct involved "'an element of judgment or choice.'" *Id.* at 322 (quoting *Berkovitz*, 486 U.S. at 536); *see also Johnson v. U.S. Dept. of Interior,* 949 F.2d 332, 337 (10th Cir. 1991). The first prong is met unless "'a statute, regulation,

or policy specifically prescribes a specific course of conduct for an employee to follow.'"
*Johnson,* 949 F.2d at 336 (quoting *Berkovitz,* 486 U.S. at 536); *see also Garcia v. U.S. Air Force,*
533 F.3d 1170, 1176 (10th Cir. 2008) ("Conduct is not discretionary if a federal statute,
regulation, or policy specifically prescribes a course of action for an employee to follow. In this
event, the employee has no rightful option but to adhere to the directive") (quotations omitted).
"When established governmental policy, as expressed or implied by statute, regulation, or
agency guidelines, allows a government agent to exercise discretion, it must be presumed that the
agent's acts are grounded in policy when exercising that discretion." *Ball v. United States,* 967
F.3d 1072, 1076 (10th Cir. 2020) (citing *Gaubert,* 499 U.S. at 324). Further, where the policies
that inform the conduct at issue allow the exercise of discretion, the defendant's acts or
failures to act are presumed to be discretionary. *Lam v. United States*, 979 F.3d 665, 674
(9th Cir. 2020). Finally, the applicable policies and authorities must be considered in
context – "the presence of a few, isolated provisions cast in mandatory language does not
transform an otherwise suggestive set of guidelines into binding agency regulations." *Id*.
at 677 (citing *Gonzalez v. U.S.* 814 F.3d 1022, 1030 (9th Cir. 2016)).

Second, if the conduct involves choice or discretion, courts must next determine
whether the judgment of the government employee was "of the kind that the discretionary
function exception was designed to shield." *Gaubert*, 499 U.S. at 322-23. Recognizing that
tort actions challenging the government's discretionary policy judgments could "seriously
handicap efficient government operations," Congress designed the DFE to "prevent
judicial second-guessing of legislative and administrative decisions grounded in social,
economic, and political policy" through a tort action. *United States v. Varig Airlines*, 467

U.S. 797, 814 (1984). The focus of this inquiry is whether the "nature of the actions taken," pursuant to an exercise of discretion, "are susceptible to policy analysis." *Gaubert*, 499 U.S. at 325.

A court "need not find that a government employee made a conscious decision regarding policy considerations in order to satisfy the second prong of the *Berkovitz* test." *Lopez v. U.S.,* 376 F.3d 1055 (10th Cir. 2004). Indeed, under the second prong, the government actors' subjective motive is immaterial: "the focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred by statute or regulation" but rather "on the nature of the actions taken and on whether they are *susceptible* to policy analysis." *Gonzalez,* 814 F.3d at 1027-28 (quoting *Gaubert,* 499 U.S. at 325) (emphasis added). Where the relevant policies provide for discretion, it must be presumed that the government's actions are grounded in policy when exercising that discretion. *Lam*, 979 F.3d at 681 (citing *Gaubert*, 499 U.S. at 324; *Chadd*, 794 F.3d at 1104). And the statutory text confirms that the exception applies "whether or not the discretion involved [was] abused" by United States officials. 28 U.S.C. § 2680(a).

If both prongs of the *Gaubert/Berkowitz* test are met, the DFE applies, the United States retains its sovereign immunity, the court lacks jurisdiction, and the claim must be dismissed. This result applies even where the government may have been negligent in the performance of such discretionary acts, as "negligence is irrelevant" to the discretionary function inquiry. *Warren v. United States,* 244 F.Supp.3d 1173, 1223 (D.N.M. 2017). As the legislative history of the FTCA explains, the statute's limited waiver of sovereign immunity was "not intended to authorize suit for damages to test the validity of or provide

21

a remedy on account of such discretionary acts even though negligently performed and involving an abuse of discretion." H.R. Rep. No. 77-2245, 77th Cong., 2d Sess., at 10.

> **2.** **The decisions to prosecute Plaintiff Sabillon Paz under the Zero-Tolerance Policy and then to detain him in secure adult detention facilities pending his Credible Fear Interview are discretionary.**

Plaintiffs' claims based on the decisions to prosecute Plaintiff Sabillon Paz and to detain him pending prosecution or credible fear interview, which resulted in the separation of Plaintiff Sabillon Paz and Plaintiff A.E.S.E., are barred by the DFE because these decisions involved an element of judgment or choice and are susceptible to policy analysis. Plaintiffs do not contest that CBP lawfully apprehended them after they crossed the border illegally. Nor do Plaintiffs contest that Plaintiff Sabillon Paz was properly subject to prosecution under 8 U.S.C. § 1325, or that the government had discretion to prosecute him. Plaintiffs do not dispute that the government had discretion to transfer Plaintiff Sabillon Paz to criminal custody in connection with his potential prosecution. And Plaintiffs do not dispute that the government had discretion to deem A.E.S.E. unaccompanied within the meaning of the TVPRA.

These decisions, which together resulted in A.E.S.E.'s placement in the care and custody of ORR, are quintessentially discretionary. As the Supreme Court has recognized, "[t]he Attorney General and United States Attorneys retain 'broad discretion' to enforce the Nation's criminal laws." *United States v. Armstrong*, 517 U.S. 456, 464 (1996). Indeed, "[t]he Supreme Court has long recognized that 'the Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case.'" *In re Sealed Case*, 829 F.2d 50, 63 (D.C. Cir. 1987) (quoting *United States v. Nixon*, 418 U.S. 683, 693

(1974)); *Smith v. United States*, 375 F.2d 243, 247 (5th Cir. 1967) ("decisions concerning enforcement" are matter of "discretion").

As other courts have recognized, the particular prosecution policy that was in place when Plaintiff was prosecuted—the Zero-Tolerance Policy, which was subsequently revoked—"amounts to exercise of the prosecutorial discretion that Congress and the Constitution confer on the Attorney General." *Mejia-Mejia v. ICE*, No 18-1445 (PLF), 2019 WL 4707150, at *5 (D.D.C. Sept. 26, 2019); *see also Peña Arita*, 470 F. Supp. 3d at 686-87. The DFE bars the Court from "second-guessing" or inquiring into government actors' intent in exercising that prosecutorial discretion. *Berkovitz*, 486 U.S. at 536; *see also Lam*, 979 F.3d at 673 (citing *Varig*, 467 U.S. at 814). In determining the applicability of the DFE, the Court looks only at whether the conduct or decision at issue is "'susceptible' to policy analysis" from an objective perspective – subjective intent is not part of the inquiry. *Gonzalez*, 814 F.3d at 1032. Here, however, the government's decisions were not merely "susceptible to" policy analysis, but the government spelled out the policies it sought to further through its enforcement efforts in a series of Executive Branch directives, as the Complaint itself notes. *See*, *e.g.*, Doc. 1, ¶ 20.

The government's decisions concerning where to detain Plaintiff Sabillon Paz pending prosecution and its evaluation of his claim for asylum were also discretionary and susceptible to policy analysis. Concerns about "subjecting the prosecutor's motives and decision making to outside inquiry" are magnified in the immigration context. *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 490 (1999). There, the federal government possesses the express statutory authority to "arrange for appropriate places of

23

detention for aliens detained pending removal or a decision on removal." 8 U.S.C. § 1231(g)(1).[4] "Congress has placed the responsibility of determining where aliens are detained within the discretion of the [Secretary]." *Comm. of Cent. Am. Refugees v. I.N.S.*, 795 F.2d 1434, 1440 (9th Cir. 1986) (emphasis added); *see also Gandarillas-Zambrana v. BIA*, 44 F.3d 1251, 1256 (4th Cir. 1995) ("The INS necessarily has the authority to determine the location of detention of an alien in deportation proceedings . . . and therefore, to transfer aliens from one detention center to another."); *Sasso v. Milhollan*, 735 F. Supp. 1045, 1046 (S.D. Fla. 1990) (holding that the Attorney General has discretion over the location of detention); *Van Dinh v. Reno*, 197 F.3d 427, 433 (10th Cir. 1999) (holding that the "Attorney General's discretionary power to transfer aliens from one locale to another, as she deems appropriate, arises from" statute).

As the Ninth Circuit has explained, "[b]ecause the decision to detain an alien pending resolution of immigration proceedings is explicitly committed to the discretion of the Attorney General and implicates issues of foreign policy, it falls within this [FTCA] exception." *Mirmehdi v. United States*, 662 F.3d 1073, 1081-82 (9th Cir. 2011); *see also Cohen v. United States*, 151 F.3d 1338, 1342 (11th Cir. 1998) (decisions where to place prisoners are policy-based decisions protected by DFE); *Bailor v. Salvation Army*, 51 F.3d 678, 685 (7th Cir. 1995) (decisions whether to detain or release are policy-based decisions protected by DFE); *Lipsey v. United States*, 879 F.3d 249, 255 (7th Cir. 2018) (placement

---

[4] Following the Homeland Security Act of 2002, many references in the INA to the "Attorney General" now mean the Secretary of Homeland Security. *See Clark v. Suarez Martinez*, 543 U.S. 371, 374 n.1 (2005).

decisions are susceptible to policy analysis); *Santana-Rosa v. United States*, 335 F.3d 39, 44 (1st Cir. 2003) ("assignment to particular institutions or units . . . must be viewed as falling within the discretionary function exception to the FTCA").

This discretion necessarily entails decisions regarding where and with whom noncitizens are detained, including decisions regarding whether adults and minors can be detained in the same facility and whether to detain family members together. *See Peña Arita v. United States*, 470 F. Supp. 3d 663, 691-92 (S.D. Tex. 2020) (decisions by DHS to separate family members are protected by the DFE). Although the Flores Agreement contains some requirements concerning the detention of minors, it does not specifically prescribe a course of action and thus does not remove the government's discretion. Moreover, the Flores Agreement does not require release of a parent or mandate that parents be housed with their children. *Flores*, 828 F.3d at 908; *see also Dominguez-Portillo*, 2018 WL 315759, at *14-15; *Bunikyte*, 2007 WL 1074070, at *16. In this case, Plaintiffs allege "the [government's] implementation of the family separation policy against A.E.S.E. and Mr. Sabillon Paz …violated their constitutional rights," Doc. 1, ¶ 132, but Plaintiffs do not actually cite any statutes, regulations, policies, or constitutional provisions that prescribe a specific course of action that the government was required to take in connection with the prosecution and detention of Plaintiff Sabillon Paz. Instead, the challenged decisions were the result of the exercise of discretion. Accordingly, the exercise of the statutory authority regarding whether and where to detain Plaintiff Sabilllon Paz during and after his criminal proceedings and during the credible fear interview process is protected by the DFE.

For similar reasons, the decision to determine that A.E.S.E was "unaccompanied" within the meaning of the TVPRA is a decision covered by the DFE. *See* 6 U.S.C. § 279(g)(2). Whether a parent is "available to provide care and physical custody" is a policy question vested in federal officials. *See D.B. v. Poston*, 119 F. Supp. 3d 472, 482-83 (E.D. Va. 2015) ("Federal agencies are afforded discretion under the statutory scheme when classifying juveniles as unaccompanied alien children."), *aff'd in part and vacated in part*, 826 F.3d 721 (4th Cir. 2016); *see also Baie v. Secretary of Def.*, 984 F.2d 1375, 1377 (9th Cir. 1986) ("[I]nterpretation of the statute is a plainly discretionary administrative act the 'nature and quality' of which Congress intended to shield from liability under the FTCA."); *Medina v. United States*, 259 F.3d 220, 227 (4th Cir. 2001) (determining whether conduct constituted "crime of moral turpitude" under applicable statute was "a quintessential exercise of [agency's] broad discretion"). Here, Plaintiff Sabillon Paz was detained pending prosecution and his credible fear interview, and transferred to the custody of the U.S. Marshal's Service. In those circumstances, the DFE protects the officials' determination that Plaintiff A.E.S.E. should have been deemed unaccompanied and thus transferred to the custody of ORR. *See Fisher Bros. Sales, Inc. v. United States*, 46 F.3d 279, 287 (3d Cir. 1995) (holding that a decision was protected by the DFE when it "necessarily reflects the decisionmaker's judgment that it is more desirable to make a decision based on the currently available information than to wait for more complete data or more confirmation of the existing data.").

In the end, Plaintiffs do not allege injury from any government action or decision that was not subject to discretion and susceptible to policy analysis for the Subject Claims.

26

To the extent that Plaintiffs suggest that the government was required to release them into the interior, did not have the discretion to make a determination to prosecute Plaintiff Sabillon Paz for criminal violations of immigration law, did not have discretion to evaluate and make a decision on his claim for asylum, or did not have discretionary authority to determine that Plaintiff A.E.S.E. was unaccompanied, these decisions are quintessential discretionary policy judgments.  And, while such judgments may be challenged through other means—such as in suits brought under the Administrative Procedure Act or the judicial-review provisions of the Immigration and Nationality Act—Congress, in enacting the DFE, chose to protect the United States from monetary liability for its discretionary policy judgments.  Plaintiffs' Subject Claims are therefore barred.

### 3.    Plaintiffs' remaining claims concerning their conditions of confinement are barred by the discretionary function exception.

Plaintiffs also bring claims related to their treatment while in custody. Among other things, Plaintiffs allege that CBP officials provided "no place to rest in their crowded, dirty, unhygienic cell in the *heilera*" and offered only "a small juice box and cold burrito" to drink and eat. *Id.*, ¶¶ 35,38. Plaintiffs further allege that government officials limited calls between Plaintiff A.E.S.E and her parents. *Id.,* ¶¶ 99-100.

Courts have repeatedly held that claims based on acts or omissions relating to "conditions of confinement" are barred by the DFE because the manner in which the government manages and operates its detention facilities involves discretionary decisions susceptible to policy considerations. *See, e.g., Bultema v. United States*, 359 F.3d 379, 384 (6th Cir. 2004) (decision not to provide bed rails susceptible to policy considerations);

*Campos v. United States*, 888 F.3d 724, 733 (5th Cir. 2018) (deficiencies in computer database that failed to reveal immigration status protected by discretionary function exception); *Cosby v. Marshals Service*, 520 F. App'x 819, 821 (11th Cir. 2013) (detainee decisions involve "several policy considerations . . . including prison security, the allocation of finite resources, and the logistics of prisoner transportation if transfer to an off-site facility is an option"); *Patel v. United States*, 398 F. App'x 22, 29 (5th Cir. 2010) (DFE shielded decision to transfer prisoner); *Antonelli v. Crow*, No. 08-261, 2012 WL 4215024, at *3 (E.D. Ky. Sept. 19, 2012) (collecting cases in which myriad conditions of confinement claims, including claims based on temperature and crowding, barred by DFE); *Lineberry v. United States*, No. 3:08-cv-0597, 2009 WL 763052, at *6 (N.D. Tex. Mar. 23, 2009) ("Plaintiff's allegation of negligent overcrowding falls within the discretionary function exception"). In particular, courts have held that detained individuals have "no right to unlimited telephone use," *Washington v. Reno*, 35 F.3d 1093, 1100 (6th Cir. 1994), and that a detainee's right to telephone access is "subject to rational limitations in the face of legitimate security interests," *id.* (quoting *Strandberg v. City of Helena*, 791 F.2d 744, 747 (9th Cir. 1986)); *see also Harrison v. Fed. Bureau of Prisons*, 464 F. Supp. 2d 552, 559 (E.D. Va. 2006) ("[T]he BOP's provision of telephone services is a matter committed to its discretion that will not be second-guessed through an FTCA claim."). Accordingly, while the government is committed to safe and humane treatment of every individual in detention, Plaintiffs' conditions-of-confinement claims are barred by the DFE.

    **4.**    **Plaintiffs' assertion of unconstitutional conduct does not preclude application of the discretionary function exception.**

That Plaintiffs claim that certain alleged conduct violated the Constitution does not alter the discretionary function analysis. Congress did not create the FTCA to address constitutional violations, but rather to address violations of state tort law committed by federal employees. *See FDIC v. Meyer*, 510 U.S. 471, 477 (1994) (recognizing that § 1346(b) does not provide a cause of action for" a "constitutional tort claim"). As noted, the Supreme Court has explained that when a "federal statute, regulation, or policy *specifically prescribes* a course of action for an employee to follow," there is no further discretion to exercise. *Gaubert*, 499 U.S. at 322 (quoting *Berkovitz*, 486 U.S. at 536) (emphasis added). The Constitution is no different: in some cases, the Constitution may establish such a specific prescription that it removes an official's discretion, but the requirement of specificity applies with the same force whether the prescription is found in the Constitution or a statute.

The Supreme Court has long recognized that conduct may be discretionary even if it is later determined to have violated the Constitution. The common law doctrine of official immunity thus applies to the exercise of "discretionary functions" even when the conduct violated the Constitution, so long as the constitutional right was not defined with sufficient specificity that the official should have known the act was prohibited. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) ("[G]overnment officials performing discretionary functions[] generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."); *see also*, *e.g.*, *Wilson v. Layne*, 526 U.S. 603, 614-615 (1999) (applying the "discretionary function[]" formulation and holding that officers were entitled

to qualified immunity because, although their conduct violated the Fourth Amendment, the law was not clearly established at the time).

Thus, when the Supreme Court in *Berkovitz* held that a federal mandate must "specifically prescribe[]" conduct in order to overcome the DFE, it referred to official immunity precedent, underscoring that the two standards operate in tandem. 486 U.S. at 536 (citing *Westfall v. Erwin*, 484 U.S. 292, 296-297 (1988)). Accordingly, the DFE is not made inapplicable by every allegation of unlawful or unconstitutional conduct, but only by a showing that the government official's discretion was cabined by a specific, clearly established directive, accompanied by plausible assertions that the specific directive was violated. *See, e.g.*, *Bryan v. United States*, 913 F.3d 356, 364 (3d Cir. 2019) ("Because . . . the CBP officers did not violate clearly established constitutional rights, the FTCA claims also fail" under the discretionary function exception.).

Indeed, even before it specifically addressed the qualified immunity standards applicable to federal employees, the Supreme Court in *Butz v. Economou*, 438 U.S. 478 (1978), explicitly recognized that the DFE would apply even if alleged conduct might later be held unconstitutional. The Court in that case held that officials sued for violations of constitutional rights were entitled to qualified, but not absolute immunity. The Court explained that were it otherwise, the recently recognized *Bivens* remedy would be illusory, and, as relevant here, it noted that "no compensation would be available from the Government, for the Tort Claims Act prohibits recovery for injuries stemming from discretionary acts, even when that discretion has been abused." *Id.* at 505. *Butz* and subsequent decisions thus leave no doubt that conduct that violates the Constitution may

constitute the type of abuse of discretion that falls within the scope of the DFE.

For these reasons, a district court in this Circuit has concluded that "application of the discretionary function exception expressly does not turn on an analysis of whether, in a given case, the federal employee abused his or her discretion (by acting unconstitutionally or otherwise). *Ramirez v. Reddish*, 2020 WL 1955366, *29 (D. Utah Apr. 23, 2020). Sitting by designation, Judge Ebel explained that "[i]t would make no sense that application of this discretionary function exception to the FTCA's waiver of sovereign immunity would require an analysis of whether the federal employee's conduct was unconstitutional, a very different inquiry than whether the challenged conduct involved the exercise of discretion." *Id.* "Moreover," the court added, "such a determination of whether the employee acted unconstitutionally in a given case would typically require a full-blown examination of the federal employee's conduct that the discretionary function exception is designed to avoid." *Id.*

These concerns apply with equal force here, where Plaintiffs have alleged actions of various kinds by various officials. Regardless of whether some or all of these acts reflected an abuse of discretion, Plaintiffs have identified nothing in the decisions of the Supreme Court or the Tenth Circuit that removed any official's discretion with respect to any of the categories of asserted actions by "specifically prescribe[ing] a course of action for an employee to follow." *Gaubert*, 499 U.S. at 322. Indeed, as the Fourth Circuit observed, "we . . . have been unable to find a substantive due process right to family unity in the context of immigration detention pending removal." *Reyna as next friend of J.F.G. v. Hott*, 921 F.3d 204, 210-11 (4th Cir. 2019). And while some decisions have concluded

that constitutional allegations made the exception inapplicable, none has analyzed the relevant standards set out in the Supreme Court's FTCA decisions and in its decisions involving official immunity.[5]  Those principles make clear that the DFE bars Plaintiffs' claims.

### B. Plaintiffs' claims relating to the decision to transfer Plaintiff A.E.S.E. to the custody of ORR is barred by the FTCA's exception for actions taken while reasonably executing the law.

Plaintiffs' claims relating to the decision to transfer Plaintiff A.E.S.E. to the custody of ORR are independently precluded because the FTCA prevents the United States from being held liable for "[a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid." 28 U.S.C. § 2680(a). Thus, "[w]here government employees act pursuant to and in furtherance of regulations, resulting harm is not compensable under the act[.]" *Dupree v. United States*, 247 F.2d 819, 824 (3d Cir. 1957); *see also Accardi v. United States*, 435 F.2d 1239, 1241 (3d Cir. 1970) (claim based on "enforcement of 'rules and regulations'" barred by § 2680(a)).

This exception "bars tests by tort action of the legality of statutes and regulations." *Dalehite v. United States*, 346 U.S. 15, 33 (1953); *see also* H.R. Rep. No. 77-2245, 77th Cong., 2d Sess., at 10 (noting that it was not "desirable or intended that the constitutionality

---

[5] *A.P.F. v. United States*, 492 F. Supp. 3d 989, 996 (D. Ariz. 2020); *Nunez Euceda v. United States*, No. 2:20-cv-10793, 2021 WL 4895748, *3 (C.D. Cal. Apr. 27, 2021); *C.M. v. United States*, No. CV-19-5217, 2020 WL 1698191, *4 (D. Ariz. Mar. 30, 2020).

of legislation, or the legality of a rule or regulation should be tested through the medium of a damage suit for tort"); *Powell v. United States*, 233 F.2d 851, 855 (10th Cir. 1956) (FTCA does not waive sovereign immunity for claims based on employees' acts "performed under and in furtherance of the regulation . . . even though the regulation may be irregular or ineffective"). Thus, where a government employee's actions are authorized by statute or regulation – even if that statute or regulation is later found unconstitutional or invalid – the claim must be dismissed for lack of subject matter jurisdiction. S*ee Borquez v. United States*, 773 F.2d 1050, 1052-53 (9th Cir. 1985).

Here, the United States is required to "transfer the custody" of children to the care of ORR "not later than 72 hours after" determining that there is no parent available to provide care and physical custody, absent exceptional circumstances. 8 U.S.C. § 1232(b)(3). In this case, the government made the determination that Plaintiff Sabillon Paz was unable to provide care and physical custody for Plaintiff A.E.S.E. because it had previously made the discretionary decisions to refer Plaintiff Sabillon Paz for criminal prosecution and detain him in a secure immigration detention facility pending his credible fear interview. Once each of those protected discretionary determinations had been made, the TVPRA required that Plaintiff A.E.S.E. be transferred to ORR custody. The enforcement of that statutory command cannot form the basis of an FTCA claim.[6]

---

[6] In reaching the contrary conclusion, district courts have stated that there is no statute or regulation "requiring the separation of Plaintiffs upon their entry into the country." *A.P.F.*, 492 F. Supp. 3d at 996; *see C.M.*, 2020 WL 1698191, *4 (similar). But, as just described, federal law does require that children be placed into ORR custody if their parents are unable to provide care and physical custody. For the reasons described above, the decision to

**C.      Plaintiffs' claims are barred because there is no private person analogue.**

Plaintiffs' claims also fail because the government acts that Plaintiffs challenge have no private-person analogue. The FTCA's waiver of sovereign immunity is limited to "circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). The statute authorizes tort recovery against the United States only "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674. The FTCA does not waive sovereign immunity for claims against the United States based on governmental "action of the type that private persons could not engage in and hence could not be liable for under local law." *Chen v. United States*, 854 F.2d 622, 626 (2d Cir. 1988) (internal quotes omitted). The FTCA "requires a court to look to the state-law liability of private entities, not to that of public entities, when assessing liability under the FTCA." *United States v. Olson*, 546 U.S. 43, 45-46 (2005). Though the private analogue need not be exact, a plaintiff must offer "a persuasive analogy" showing that the government actor sued would be subject to liability under state law if it were a private person. *Westbay Steel, Inc. v. United States*, 970 F.2d 648, 650 (9th Cir. 1992).

Because only the federal government has the authority to enforce federal criminal and immigration laws and make detention determinations, there is no private-person analogue that would support a claim under the FTCA. The alleged harms here stem from

---

detain those parents for prosecution, and to detain them pending removal, is a quintessentially discretionary one.  As to the other cases decided in this District, the plaintiffs were not charged with any crime, and those decisions are distinguishable on that basis.

the federal government's decision to enforce federal immigration laws, criminally prosecute certain individuals, and hold parents in custody pending immigration proceedings or prosecution, resulting in their children's placement in the care and custody of ORR. The United States has not waived its sovereign immunity for such decisions to enforce federal law, as they have no private-person counterpart. *See, e.g., Elgamal v. Bernacke*, 714 F. App'x 741, 742 (9th Cir. 2018) ("[B]ecause no private person could be sued for anything sufficiently analogous to the negligent denial of an immigration status adjustment application, that claim must be dismissed as well."); *Elgamal v. United States*, No. 13-00967, 2015 WL 13648070, at *5 (D. Ariz. July 8, 2015) (recognizing that "immigration matters" are "an inherently governmental function"); *Bhuiyan v. United States*, 772 F. App'x 564, 565 (9th Cir. 2019) ("[T]here is, as a general matter, no private analogue to governmental withdrawal of immigration benefits.").

## VI.   CONCLUSION.

For the foregoing reasons, Defendant requests that this action be transferred to the Western District of Texas or, in the alternative, that the Subject Claims be dismissed for lack of subject matter jurisdiction.

Respectfully submitted,

FRED J. FEDERICI

United States Attorney


*/s/ Kimberly Bell  2/18/22*
KIMBERLY BEL
Assistant United States Attorney
P.O. Box 607
Albuquerque, New Mexico 87103
(505) 224-1458
Fax: (505) 346-7205
Kimberly.Bell@usdoj.gov

*Attorneys for the United States of America*


## CERTIFICATE OF SERVICE

I hereby certify that on February 18, 2022,  I filed the foregoing pleading electronically through the CM/ECF system which caused all parties or counsel of record to be served by electronic means as more fully reflected on the Notice of Electronic Filing.


*/s/ Kimberly Bell 2/18/22*
KIMBERLY BELL
Assistant United States Attorney