# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

_____

A.E.S.E., a minor child, and Eusebio Daniel
Sabillon Paz, her father,

            Plaintiffs,

    v.

United States of America and Management &
Training Corporation,

            Defendants.

_____

)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 2:21-cv-00569-RB-GBW


**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT MANAGEMENT &
TRAINING CORPORATION'S MOTION TO SEVER**

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................... 1

FACTUAL BACKGROUND ................................................................................................. 2

I.    Plaintiffs are Forcibly Separated After Entering the United States ........................................... 2

II.    Mr. Sabillon Paz's Detention in Federal and MTC Facilities ................................................. 3

III.    Plaintiffs Are Released from Custody ................................................................................. 6

ARGUMENT ........................................................................................................................ 7

I.    The Motion is Premature .......................................................................................................... 8

II.    Even if the Motion is not Premature, Severance is Inappropriate on the Merits .............. 10

    A.    Plaintiffs' Claims Satisfy Rule 20(a)'s Permissive Joinder Standard ........................... 10

    B.    MTC Has Not Established that Severance Will Serve the Interests of Justice and Judicial Economy ................................................................................................................ 14

CONCLUSION ..................................................................................................................... 16

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

C ASES

*Aguilar v. Schiff Nutrition Int'l, Inc.*,
No. 2:07-CV-504-TC, 2008 WL 4526051 (D. Utah Sept. 29, 2008) ......................................12

*Cramer v. Fedco Auto. Components Co.*,
No. 01-CV-0757E (SR), 2002 WL 1677694 (W.D.N.Y. July 18, 2002) .................................9

*DZ Bank AG Deutsche Zentral-Genossenschaftsbank v. All Gen. Lines Ins., LLC*,
No. 10-02126-JAR-JPO, 2010 WL 4683583 (D. Kan. Nov. 10, 2010)....................................8

*Estrada v. McHugh*,
No. CV 10-592 JCH/GBW, 2012 WL 13076247 (D.N.M. Oct. 19, 2012) .................7, 11, 12

*Fraihat v. U.S. Immigr. & Customs Enf't*,
No. EDCV 19-1546 JGB(SHKx), 2020 WL 2759848 (C.D. Cal. Apr. 15,
2020) ....................................................................................................................................14

*Gutta v. Renaud*,
No. 20-CV-06579-DMR, 2021 WL 533757 (N.D. Cal. Feb. 12, 2021)..................................14

*Martinez v. Robinson*,
No. 99-cv-11911 (DAB)(JCF), 2002 WL 424680 (S.D.N.Y. Mar. 19, 2002)..........................9

*Nasious v. City & Cnty. of Denver*,
415 F. App'x 877 (10th Cir. 2011) ..........................................................................................7

*Nelson v. Chertoff*,
No. 07 C 2991, 2008 WL 4211577 (N.D. Ill. Sept. 10, 2008)..................................................9

*Owusu v. Mich. Dep't of Corr. Pain Mgmt. Comm.*,
No. 16-CV-12490, 2017 WL 8893594 (E.D. Mich. Aug. 21, 2017), *report &
recommendation adopted*, 2018 WL 774152 (E.D. Mich. Feb. 8, 2018) .........................12, 14

*S. Poverty L. Ctr. v. U.S. Dep't of Homeland Sec.*,
No. CV 18-760 (CKK), 2019 WL 2077120 (D.D.C. May 10, 2019) .....................................11

*S.E.C. v. Woodruff*,
778 F. Supp. 2d 1073 (D. Colo. 2011)...................................................................................16

*Sheets v. CTS Wireless Components, Inc.*,
213 F. Supp. 2d 1279 (D.N.M. 2002) ...............................................................................7, 12

*Tab Express Int'l, Inc. v. Aviation Simulation Tech., Inc.*,
    215 F.R.D. 621 (D. Kan. 2003)..................................................................15

*Tarin v. RWI Constr., Inc.*,
    No. CV 12-145 CG/LAM, 2012 WL 12354227 (D.N.M. July 13, 2012) ......................7, 8, 10

*United Mine Workers of Am. v. Gibbs*,
    383 U.S. 715 (1966).......................................................................7

*United States v. Arkansas*,
    No. 4:09CV00033 JLH, 2010 WL 2179114 (E.D. Ark. May 27, 2010) ...................8

*Wilson v. Georgie Boy Mfg., Inc.*,
    No. C2-01-1288, 2003 WL 1868719 (S.D. Ohio Mar. 20, 2003)..........................16

**STATUTES AND RULES**

8 U.S.C. § 1325............................................................................3

FED. R. CIV. P. 20........................................................................ passim

Fed. R. Civ. P. 21......................................................................1, 7

Plaintiffs, by and through their attorneys of record, submit the following response in opposition to the Defendant Management & Training Corporation's Motion to Sever (the "Motion" or "Mot"), ECF No. 28. For the reasons discussed herein, Plaintiffs respectfully request that the Motion be denied.

## INTRODUCTION

Plaintiffs Eusebio Daniel Sabillon Paz and his minor daughter, A.E.S.E., bring claims against the United States of America (the "Government") and Management and Training Corporation ("MTC" and, with the Government, "Defendants") for the inhumane mistreatment and abuse they experienced as a result of the Government's implementation and MTC's participation in a pernicious "zero-tolerance" policy of separating and detaining families crossing the U.S.-Mexico border for the purported purpose of deterring migrants from seeking asylum in the United States. MTC argues the claims against it are distinct from those against the Government and should be severed pursuant to Fed. R. Civ. P. 21. The Motion is both premature at this early stage of the case and unsupported by the pleadings filed in the case thus far, which comprise the only record before this Court.

To date, there has been no discovery in this case. MTC does not offer any evidence to support its bare statement that it would be prejudiced if severance is not granted now. Similarly, MTC has not established that the claims against it are so wholly distinct from those against the Government that severance is necessary. Although MTC did not devise the zero-tolerance policy, it cannot escape the fact that it was an active participant in implementing the policy to the severe detriment of these Plaintiffs. MTC agreed to operate and maintain Immigration and Customs Enforcement ("ICE") detention centers used to detain separated immigrants like Mr. Sabillon Paz, who endured unconscionable abuse and medical neglect at the hands of both Government officers

and contractors at MTC's Otero County Processing Center ("Otero"). Conspicuously absent from the Motion is any acknowledgement that (i) every legal claim Plaintiffs bring against MTC is also asserted against the Government or (ii) the details of the events at Otero as alleged in the Complaint implicate both MTC and the Government.[1]

Accordingly, and as further detailed below, severance of Plaintiffs' claims would be both premature at this nascent stage of the case and inappropriate given the intertwined nature of the relevant facts and legal theories. For these reasons, MTC's motion to sever should be denied.

## FACTUAL BACKGROUND

### I.   Plaintiffs are Forcibly Separated After Entering the United States

In May 2018, Mr. Sabillon Paz and his daughter A.E.S.E. fled their home in Honduras to escape the escalating threats and political violence targeted at their family on account of Mr. Sabillon Paz's political activism and criticisms of the Honduran government. Plaintiffs' intended destination was the United States, where they planned to seek asylum. Compl. ¶ 2, ECF No. 1.

Plaintiffs attempted to present themselves as asylum seekers at a port of entry along the southwestern United States border multiple times, but each time they were turned away. *Id.* ¶ 28. Growing desperate, on or about May 29, 2018, Plaintiffs crossed into the United States between ports of entry and waited to be apprehended by U.S. Customs and Border Patrol ("CBP") agents. *Id.* ¶¶ 28–29. When CBP agents eventually approached, Mr. Sabillon Paz attempted to present himself to them as an asylum seeker, but the agents aggressively handcuffed him and boarded Plaintiffs into a CBP vehicle. *Id.* ¶¶ 30–32.

---

[1] Plaintiffs assert the following legal claims against the Government and MTC, respectively: (1) intentional infliction of emotional distress (Counts I and IX); (2) assault and battery (Counts II and X); (3) negligence (Counts VI and XI); (4) medical negligence (Counts VII and XII); and (5) negligent supervision (Counts VIII and XIII) against both MTC and the Government.

The CBP agents then transported Plaintiffs to what they believe to be the Paso Del Norte Processing Center. The conditions at this holding center, commonly referred to by asylum seekers an "*hielera*" (an "icebox," in Spanish) because of the freezing cold temperatures, were cramped and unsanitary. *Id.* ¶¶ 33–40.

On or about May 31, 2018, Plaintiffs were taken out of their cell and lined up with the other families at the holding facility. *Id.* ¶ 42. Acting pursuant to the "zero-tolerance" family separation policy, Government officers forcibly separated parents and children, including Mr. Sabillon Paz and A.E.S.E. *Id.*

## II.     Mr. Sabillon Paz's Detention in Federal and MTC Facilities

Shortly after his daughter was taken away from him, Mr. Sabillon Paz was transferred to what he believes was a federal prison, as he had been charged under 8 U.S.C. § 1325(a)(1) with the misdemeanor crime of improper entry by a noncitizen. *Id.* ¶¶ 46-47. Mr. Sabillon Paz was detained at this prison until June 21, 2018, when all charges against him were voluntarily dismissed. *Id.* ¶ 48. During the time he was detained at the federal prison, Mr. Sabillon Paz experienced severe abdominal pain, headaches, fever, and pain while urinating. *Id.* ¶ 51. He requested medical care at least ten times, but all of his requests were ignored. *Id.* The pain was so intense that there were multiple instances in which Mr. Sabillon Paz nearly lost consciousness. Mr. Paz believes he passed a kidney stone while showering at the federal prison, but he was never evaluated or offered any treatment. *Id.*

With the federal charges against him dismissed, Mr. Sabillon Paz was transferred to the custody ICE at the Otero facility operated by MTC in Chaparral, New Mexico. *Id.* ¶ 52. Mr. Sabillon Paz believes he was transported by federal authorities who made the transfer process abusive, painful, and traumatic. *Id.* ¶¶ 53–58. During the transfer, Mr. Sabillon Paz continued to

experience extreme abdominal pain, which he now attributes to subsequently diagnosed kidney stones. *Id.* ¶ 57. He requested medical attention but was ignored and prevented from using the restroom during the transfer. *Id.* Upon arriving at Otero, Mr. Sabillon Paz and the other men were held outside in a fenced area in the extreme heat for approximately four hours before anyone began to process them. *Id.* ¶ 56.

Mr. Sabillon Paz then spent approximately three weeks at Otero. While he was there, Government officials and MTC employees physically and emotionally abused Mr. Sabillon Paz, punishing him when he would ask about A.E.S.E. and trying to coerce him into abandoning his lawful claim for asylum. *Id.* ¶ 60. Mr. Sabillon Paz knew there was a mix of Government and MTC employees at Otero, as they wore different uniforms. *Id.*

Mr. Sabillon Paz was detained at Otero in one cell with approximately 50 other men. *Id.* ¶ 61. All 50 men shared six toilets, and there was no privacy, as all the toilets stood in a row in the corner of the cell. *Id.* The men were required to clean the cell and toilets each day. *Id.* The water that was available from the sinks was dirty and painfully hot, while the Otero facility maintained an extremely cold room temperature, much like CBP did in the hielera. *Id.* ¶¶ 61, 63. Mr. Sabillon Paz only had a thin sheet to sleep with and wore socks on his hands and feet to endure the cold. *Id.* ¶ 63. The only food available at Otero was extremely spicy and caused Mr. Sabillon Paz to experience frequent stomachaches, nausea, and painful diarrhea. *Id.*

If MTC employees were displeased with how detainees were carrying out their orders, they would shove the men or seize them forcefully by the arms. *Id.* ¶ 62. Mr. Sabillon Paz experienced such treatment, and on one occasion an MTC employee spat on him. *Id.* MTC employees also typically ignored his requests for information about A.E.S.E., though sometimes they would grow upset with Mr. Sabillon Paz and the other men asking for information about their children. *Id.* ¶ 64.

4

Multiple times, and despite Mr. Sabillon Paz's obvious emotional distress, MTC employees would mock him for crying and tell him that he would "never see his child again." *Id.*

At Otero, Government officers repeatedly attempted to leverage Mr. Sabillon Paz's separation from his daughter and the circumstances of his detention in an unlawful effort to coerce him into abandoning his asylum claim. *Id.* ¶ 65. On numerous occasions, officers told him that he should sign his deportation papers and that things would "go easier for him" if he did. *Id.* One Government officer even attempted to mislead Mr. Sabillon Paz about the contents of a documents, telling him that what he was being asked to sign was not related to deportation. *Id.* ¶ 66. However, the document was in English, which Mr. Sabillon Paz understands, and Mr. Sabillon Paz knew the officer's representations were untrue. *Id.* When he indicated that he understood the document's contents, the officer quipped "Oh, you read English? So you turned out to be smart." *Id.*

Government officers would also take groups of detainees out of their cells to a separate office to pressure them to sign deportation papers. *Id.* ¶ 67. When Mr. Sabillon Paz met with these officers, they claimed if he signed his deportation papers they would try to arrange for A.E.S.E. to be sent back to Honduras with him. *Id.* Officers presented his options as either agreeing to deportation and potentially being reunited with his daughter, or continuing to fight his asylum claim, which would involve waiting one to two years in detention to potentially be deported, possibly without A.E.S.E. *Id.*

Similarly, MTC employees at Otero attempted to manipulate Mr. Sabillon Paz's Christian religious beliefs in an effort to coerce him into accepting deportation. *Id.* ¶¶ 69–71. They would allow him to attend Christian services, but they were led by a pastor who told the detainees they were "sinners" for "breaking the law" and crossing the border, that they were "bad men" who abandoned their wives to "other men," that God would judge them for coming to the United States,

5

and that failing to sign the deportation papers was a sin. *Id.* ¶ 69. Additionally, on at least two occasions, MTC employees at Otero instructed Mr. Sabillon Paz and other detainees to attend a presentation by a purported social assistance organization. *Id.* ¶ 71. The attendees were told that volunteers from this organization would provide information about their children, but once the presentation began, the volunteers attempted to pressure the attendees into accepting deportation and forced them to listen to a pastor's speech, who once again tried to convince the men that they were "sinners" and should sign the deportation papers. *Id.* All the while, MTC employees stood around the men during the presentations, forcing Mr. Sabillon Paz and others to stay and listen. *Id.*

Mr. Otero experienced extreme abdominal pain, bleeding while urinating and kidney stones throughout his detention at Otero, conditions he had developed prior to his arrival at Otero. *Id.* ¶74. He requested medical care every day but was frequently ignored or told to "be quiet" and "stop complaining." *Id.* ¶ 75. At one point, Mr. Sabillon Paz was in intense pain as he passed a kidney stone and an MTC employee said to him: "If you're going to die, just die already and save us all some time." *Id.* Another time, the pain was so intense he collapsed in his cell. *Id.* ¶ 76. Only then was he permitted to see a nurse who told him he was "putting on a show" and did not treat him. *Id.* Other MTC employees who served as healthcare officers similarly dismissed his concerns. *Id.* ¶ 77. One nurse did confirm Mr. Sabillon Paz was suffering from kidney stones, but she said there was nothing she could do for him. *Id.* And although Mr. Sabillon Paz was twice placed in medical isolation, he was only ever offered a single Tylenol tablet for his pain. *Id.* ¶ 78.

### III.    Plaintiffs Are Released from Custody

Mr. Sabillon Paz was eventually given, and passed, a Credible Fear Interview ("CFI") as part of his asylum process. *Id.* ¶ 72. On July 19, 2018, after roughly 50 days apart, Mr. Sabillon Paz and his daughter were transferred to an ICE field office in El Paso, Texas and released from

custody that day. *Id.* ¶ 102. Both Mr. Sabillon Paz and A.E.S.E. endured much neglect and abuse during their time in detention as a result of the "zero-tolerance" family separation policy. *See e.g.*, *Id.* ¶ 106. ("A.E.S.E. continues to experience physical and psychological symptoms as a result of the separation, detention, medical neglect, and abuse she experienced. She still has nightmares about the sexual assault and difficulty sleeping.").

## ARGUMENT

Pursuant to Federal Rule of Civil Procedure 21, federal courts have wide discretion to "add or drop a party . . . [or] sever any claim against a party" that has not been properly joined to the action. FED. R. CIV. P. 21. Severance motions under Rule 21 are assessed using Federal Rule of Civil Procedure 20(a)'s joinder standards, which provide that claims are properly joined if they either (1) arise out of the same transaction or occurrence, or transactions or occurrences, or (2) raise common questions or law or fact. FED. R. CIV. P. 20(a)(2); *Estrada v. McHugh*, No. CV 10-592 JCH/GBW, 2012 WL 13076247, at *2 (D.N.M. Oct. 19, 2012) (citing *Nasious v. City & Cnty. of Denver*, 415 F. App'x 877, 880 (10th Cir. 2011)). "In order to ascertain if a particular factual situation constitutes a transaction or occurrence for the purposes of Rule 20, courts consider whether a 'logical relationship' exists amongst and between the claims." *Id.* (citing *Sheets v. CTS Wireless Components, Inc.*, 213 F. Supp. 2d 1279, 1286 (D.N.M. 2002)). "Under the Rules, the impulse is toward entertaining the broadest possible scope of action consistent with fairness to the parties; joinder of claims, parties and remedies is strongly encouraged." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 724 (1966).

When deciding a motion to sever under Rule 21, a court should consider whether it is fully informed about the claims at issue and only decide the motion if it can answer in the affirmative. *Tarin v. RWI Constr., Inc.*, No. CV 12-145 CG/LAM, 2012 WL 12354227, at *3 (D.N.M. July 13,

2012) (holding federal trial courts should exercise their discretion "only after the court is fully informed"). The court must then "weigh[] the potential prejudice to the movant if severance is denied against the potential prejudice to the nonmovant if severance is granted." *DZ Bank AG Deutsche Zentral-Genossenschaftsbank v. All Gen. Lines Ins., LLC*, No. 10-02126-JAR-JPO, 2010 WL 4683583, at *6 (D. Kan. Nov. 10, 2010). Courts ordinarily presume that all claims in a case should be resolved in a single trial and not severed. *See*, *e.g.*, *United States v. Arkansas*, No. 4:09CV00033 JLH, 2010 WL 2179114, at *2 (E.D. Ark. May 27, 2010). "That presumption places the burden on the party moving for severance to show, first, that it will be *severely* prejudiced without a separate trial, and, second, that the issue to be severed is so distinct and separable from the others that a trial of that issue alone may proceed without injustice." *Id.* (emphasis added).

At this stage of the case, MTC's motion to sever is premature, as the extent of MTC's collaboration with the Government—and thus the full extent of MTC's role in the alleged misconduct—has not been fully investigated. Moreover, what is before the Court now—the allegations and admissions lodged by the parties in their respective pleadings—satisfies the Rule 20(a)'s permissive joinder standard, and MTC has not established either that it would be severely prejudiced without a separate trial or that the claims against it are so distinct and separable from those against the Government that severance is warranted at this stage of the case.

## I.   The Motion is Premature

Courts in this District have routinely found severance motions premature in cases that were even further along than this one. In *Tarin*, 2012 WL 12354227, at *3, for example, the Court held that it lacked sufficient information to determine whether severing plaintiffs' claims was appropriate where the parties had exchanged only one set of written discovery requests. The Court noted that no depositions had taken place, a scheduling conference had not yet been completed,

and the deadline to join parties had not been set, ultimately denying severance and concluding that "[d]ue to the nascent stage of these proceedings, it is unclear whether allowing the case to proceed as pled would impermissibly prejudice Defendants' rights." *Id.* Courts in other jurisdictions similarly have held that severance is premature prior to meaningful discovery. *See*, *e.g.*, *Nelson v. Chertoff*, No. 07 C 2991, 2008 WL 4211577, at *6 (N.D. Ill. Sept. 10, 2008) (denying motion to sever in newly filed case in which minimal discovery had been completed); *Martinez v. Robinson*, No. 99-cv-11911 (DAB)(JCF), 2002 WL 424680, at *2 (S.D.N.Y. Mar. 19, 2002) (denying severance motion as premature because discovery had barely begun, and, as a consequence, information necessary to evaluate the relevant factors was not yet available); *Cramer v. Fedco Auto. Components Co.*, No. 01-CV-0757E (SR), 2002 WL 1677694, at *2 (W.D.N.Y. July 18, 2002) (denying motions to sever and bifurcate as premature in case in which discovery had barely begun).

Here, all that is available to the Court to decide MTC's Motion is Plaintiffs' Complaint and MTC's Answer thereto. To date, there has been no discovery of any kind.[2] It is simply too soon to decide whether hearing all of Plaintiffs' claims together would impermissibly prejudice MTC. If

---

[2] Given the absence of any discovery in this case, and the allegations in Plaintiffs' Complaint, there is no basis for statements made by MTC like: "The factual claims involving the allegations against the USA have no overlap with witnesses, time, or even plaintiffs (A.E.S.E.) with the claims against MTC." Mot. 3. Indeed, that assertion is contradicted by the Complaint, which contains multiple allegations about Mr. Sabillon Paz's time at Otero that involve both Government officers and MTC employees. This includes allegations that Government officers at Otero tried to trick and coerce him into accepting deportation and that MTC employees pressured Mr. Sabillon Paz and other detainees into attending presentations by purported social assistance organizations and pastors that similarly advocated accepting deportation. Compl ¶¶ 60, 65-71. At this point in the case, it is not certain whether this very similar conduct on the part of the Government and MTC was coordinated as part of the zero-tolerance policy in which MTC was an active participant. But the inference that the conduct *was* coordinated and that MTC knowingly acted in furtherance of the zero-tolerance policy is certain a reasonable one.

the Court is to consider severance at any point, it should only do so once it is fully informed of the parties' relationships—both to one another and to the claims at issue—based on a fulsome discovery record. *See Tarin*, 2012 WL 12354227, at *3 (explaining that a trial court's discretion to sever claims "should be exercised only after the court is fully informed"). At present, severance is premature.

## II.   Even if the Motion is not Premature, Severance is Inappropriate on the Merits

Although the Court can (and should) deny the Motion as premature, the Motion can also be denied on the merits. Joinder of claims is appropriate under Rule 20(a) if the claims arise out of the same transaction or occurrence—which requires the existence of a "logical relationship" between the claims—or the claims present common questions of law and fact. Because MTC has not established that Plaintiffs' claims against MTC and the Government are improperly joined under either prong of Rule 20's permissive joinder standard, that MTC would be severely prejudiced if severance were denied, or that severance of Plaintiffs' claims would serve the interests of convenience and judicial economy, the Motion should be denied on the merits.

### A.   *Plaintiffs' Claims Satisfy Rule 20(a)'s Permissive Joinder Standard*

MTC incorrectly argues that the claims against it, which it narrowly characterizes as relating to Mr. Sabillon Paz's care and treatment at Otero, are "discrete and separate" from the claims against the Government. *See* Mot. 3-4. In so arguing, MTC ignores its contractual relationship with the Government[3] and the multiple allegations in the Complaint that plainly allege connections and overlap between the Government's and MTC's conduct in furtherance of the

---

[3] In MTC's Answer to Plaintiffs' Complaint, MTC admitted its contractual responsibility for the daily operations of ICE detention at Otero and that it had contractual responsibilities to provide healthcare services for detainees at the Otero facility. Answer ¶ 18, ECF No. 6.

"zero-tolerance" policy. *See*, *e.g.*, Compl. ¶¶ 8, 18-19, 52-78; *see also Estrada*, 2012 WL 13076247, at *3 (denying severance motion and noting that overlap in chain of command and the nature of the alleged discrimination suggested likely overlap in the evidence introduced to support both claims); *S. Poverty L. Ctr. v. U.S. Dep't of Homeland Sec.*, No. CV 18-760 (CKK), 2019 WL 2077120, at *2 (D.D.C. May 10, 2019) ("Resolution of the legal and factual issues in this case—even conditions that may differ from one facility to another—would seem to turn on those national standards and Defendants' enforcement of them."). Far from being "discrete and separate," allegations in the Complaint detail the mistreatment Mr. Sabillon Paz experienced while being transported between federal and MTC facilities, Compl. ¶¶ 52-58, as well as the physical and emotional abuse and medical neglect he endured at the hands of *both* Government officials and MTC employees while detained at Otero. *See*, *e.g.*, *Id.* ¶ 60 ("At Otero, government officials *and* MTC employees physical and emotionally abused Mr. Sabillon Paz to punish him for asking about A.E.S.E. and coerce him into abandoning his lawful claim for asylum. Mr. Sabillon Paz was able to distinguish government officials and MTC employees by their uniforms.") (emphasis added).

These allegations all arise from the same transaction and occurrence in that they all stem from the Government's zero-tolerance policy and MTC's role in providing assistance to the Government in connection with that policy, which resulted in Mr. Sabillon Paz's period of detention at Otero and the inhumane treatment he received there. As courts in this District have held, whether a particular factual situation constitutes a single transaction or occurrence under Rule 20 requires consideration of whether there is a "logical relationship" amongst and between the claims. *See Sheets*, 213 F. Supp. 2d at 1286.[4] Courts in this District and others have also held

---

[4] MTC cites this case as an example of multiple plaintiffs' claims failing to satisfy Rule 20(a)'s transaction and occurrence requirement, but the *Sheets* Court itself drew a distinction between the

that challenges to an overarching policy, even when different plaintiffs and locations are involved, meet Rule 20(a)'s transaction or occurrence standard. *See Estrada,* 2012 WL 13076247, at *2 (holding that although plaintiffs' discrimination claims against their government employer involved different dates, supervisors, and factual circumstances, they were logically related and thus severance was inappropriate); *Owusu v. Mich. Dep't of Corr. Pain Mgmt. Comm.*, No. 16-CV-12490, 2017 WL 8893594, at *7 (E.D. Mich. Aug. 21, 2017) (holding Michigan Department of Corrections defendants failed to establish severance of all state prisoner's claims against healthcare providers alleging inadequate medical care would be appropriate where claims would present similar questions of law and at least some overlapping facts and witnesses), *report & recommendation adopted*, 2018 WL 774152 (E.D. Mich. Feb. 8, 2018); *Aguilar v. Schiff Nutrition Int'l, Inc.*, No. 2:07-CV-504-TC, 2008 WL 4526051, at *12 (D. Utah Sept. 29, 2008) (denying motion to sever claims because defendant's alleged "pattern and practice of discrimination ... ties all of the Plaintiffs together").

Although MTC did not *craft* the zero-tolerance policy, it was as a result of that policy and MTC's responsibilities as a contractor operating ICE detention centers that Mr. Sabillon Paz was detained at MTC's Otero facility. MTC was an active—not passive—participant in the mistreatment and neglect Mr. Sabillon Paz experienced at Otero, as it was MTC that was responsible for the day-to-day operations at that facility. Answer ¶ 18. Notably, while MTC and the Government each assumed responsibility for Mr. Sabillon Paz's medical care at various points during his detention, it was MTC that was contractually obligated to provide onsite healthcare

---

facts of the case and others that stem from a larger policy or practice. In *Sheets*, plaintiffs alleged that they were retaliated against based on their particular individual disabilities, not that the defendant was perpetuating a larger policy or practice of disability discrimination. 213 F. Supp. 2d at 1281.

services for the detainees at Otero. *Id.* Whether and to what extent MTC complied with its contractual obligations with respect to Mr. Sabillon Paz's care, and whether and to what extent the Government's actions or inaction affected the condition in which Mr. Sabillon Paz arrived at Otero, demonstrate overlapping factual and temporal connections and responsibilities that establish more than a "logical relationship" amongst the claims at issue in this case. Discovery will ultimately bear out the extent to which MTC was a knowing participant in the "zero-tolerance" policy, but based on the pleadings it clearly was an active participant and there is ample basis to infer its participation was knowing and intentional.

Similarly, the claims against MTC and the Government relating to Mr. Sabillon Paz's detention at Otero are also likely to pose common questions of law and fact. Given the circumstances of Mr. Sabillon Paz's transfer between federal and MTC-owned facilities, Compl. ¶¶ 52-58, the presence of both Government officials and MTC employees at the Otero facility, *Id.* ¶ 60, and questions about the quality of medical care he received at various detention location, there are likely to be legal and factual questions about identity, agency, and authority that would be impractical not to resolve in one proceeding, and MTC's arguments have not established otherwise. All of the Counts in the Complaint directed at MTC could prompt questions about MTC's relationship with ICE and the instructions MTC received from the Government in relation to its treatment of detainees, including the provision of healthcare services. Further, Mr. Sabillon Paz's medical negligence claims against both the Government and MTC are likely to present common questions about the quality of care he received before, during, and after his detention at both federal government and MTC facilities. Here, it bears noting that the commonality required under Rule 20 is not a high bar to overcome. *See Gutta v. Renaud*, No. 20-CV-06579-DMR, 2021 WL 533757, at *6 (N.D. Cal. Feb. 12, 2021) ("Commonality is not a particularly stringent test and

Rule 20 requires only a single common question, not multiple common questions.") (internal citations and quotations omitted).

In fact, in the specific context of the administration of immigration detention contracts and the administration of healthcare to persons in government custody, courts have found commonality and declined to sever claims despite the existence of different circumstances and different conduct by different defendants. *See*, *e.g.*, *Fraihat v. U.S. Immigr. & Customs Enf't*, No. EDCV 19-1546 JGB(SHKx), 2020 WL 2759848, at *12 (C.D. Cal. Apr. 15, 2020) ("Although there are surely differences in how Defendants' practices impacted each Plaintiff, Plaintiffs assert violations of the same rights and complain of similar types of injuries. Overwhelming overlap is not required. The common question requirement in Rule 20(a) does not require that every question of law or fact in the action be common among the parties; rather, the rule permits party joinder whenever there will be at least one common question of law or fact." (internal citations and quotations omitted)); *Owusu*, 2017 WL 8893594, at *7 (denying certain defendants' motion to sever as to plaintiff's claims that were directly related to the alleged denial by multiple providers of adequate medical treatment over a five year period). Like the prisoner in *Owusu*, Mr. Sabillon Paz also pleaded facts and brought claims against multiple defendants "based on a continuum of [an] ongoing denial and/or lack of adequate medical treatment." *Id.* Mr. Sabillon Paz's claims were properly joined given their overlapping factual and legal questions, and MTC's simplistic arguments in its Motion that are untethered to the law or the facts have not established anything to the contrary.

   **B.**     ***MTC Has Not Established that Severance Will Serve the Interests of Justice and Judicial Economy***

MTC argues that "[i]t would not be difficult, costly, or prejudicial to sever" the claims against MTC and the Government, declaring that the claims against the two Defendants require

14

"different witnesses, evidence, expert witnesses, and legal arguments." Mot. 6-7. Yet, at this stage of the case, prior to discovery or disclosures of any kind, there is no basis for this conclusion. As discussed above, Mr. Sabillon Paz's claims about the medical care he received in federal and MTC facilities, as well as how he was treated when transported between these facilities and at them (*e.g.*, humiliation at the hands of Government and MTC personnel and efforts by both to persuade him to self-deport), are likely to raise questions about which defendant (or both) made the decisions relevant to Mr. Sabillon Paz's care and treatment and pursuant to what authority. In light of this, Mr. Sabillon Paz's ability to efficiently and effectively have his claims adjudicated could be prejudiced if he is forced to pursue them against the two defendants in two trials.[5] The claims against the Government and MTC are not identical, but their overlapping and intertwined nature counsel against the expense and administrative burden of trying the claims separately.

Further, MTC's arguments about the potential prejudice it would suffer before a jury if the claims are not severed are particularly premature and unfounded at this time. Such concerns can often be addressed through jury instructions. *See, e.g.*, *S.E.C. v. Woodruff*, 778 F. Supp. 2d 1073, 1098 (D. Colo. 2011) ("The Court is also confident that no prejudice will inure to either Defendant from being tried jointly with his co-Defendant, as the Court will carefully tailor its jury instructions and verdict forms to address any risk of improper spillover."); *Wilson v. Georgie Boy Mfg., Inc.*,

---

[5] MTC cites *Tab Express International, Inc. v. Aviation Simulation Technology, Inc.*, 215 F.R.D. 621, 624–25 (D. Kan. 2003), in support of its argument that severance would not substantially inconvenience Plaintiffs. However, the circumstances of this case are distinguishable. The *Tab* court exercised its discretion to sever patent infringement counterclaims from plaintiff's breach of contract and related tort and contract claims. *Id.* The court held: "After reviewing the pleadings and the arguments of both parties on this issue, the court concludes that plaintiff's claims do not involve a single question of law or fact that is also at issue in defendant's counterclaims." *Id.* at 624. Here, Plaintiffs bring largely the same set of legal claims against MTC as they do against the Government, and the claims involve overlapping facts and legal theories. *See supra* n. 1; pp. 13-15.

No. C2-01-1288, 2003 WL 1868719, at *2 (S.D. Ohio Mar. 20, 2003) ("While it is true that the claimed defects are not identical, these differences will not create confusion in the minds of a reasonable jury that cannot be overcome by jury instructions. In contrast, severance would create duplicative litigation and needless expense."). But at this point, without any discovery record at all and without knowing which claims will ultimately proceed to a jury trial, MTC's arguments about likely prejudice are purely speculative.

## CONCLUSION

MTC cannot disclaim its connection to the Government and its share of responsibility for the misconduct alleged in Plaintiffs' Complaint under the "zero tolerance" policy. The claims brought against MTC and the Government arise out of the same transaction or occurrence and present common questions of law and fact. The Court should decline to sever the claims, particularly given the nascent stage of this proceeding. Plaintiffs respectfully request that the Court decline to sever Counts I-VIII against the Government from Counts IX-XII against MTC and allow all claims to proceed together at this time.

Respectfully submitted,

March 18, 2022                                      /s/Leon Howard
                                                                    Leon Howard
Michael T. Mervis*                              Rebecca Sheff
Tara M. Brailey*                                  Zoila Alvarez Hernandez
Proskauer Rose LLP                            ACLU of New Mexico
11 Times Square                                  P.O. Box 566
New York, New York 10036                Albuquerque, NM 87103
(212) 969-3000                                    (505) 266-5915
mmervis@proskauer.com                   lhoward@aclu-nm.org
tbrailey@proskauer.com                      rsheff@aclu-nm.org
                                                                    zalvarez@aclu-nm.org

Bradley Jenkins*

16

Anne Recinos
Zachary Manfredi*
Asylum Seeker Advocacy Project (ASAP)
228 Park Ave. S. #84810
New York, NY 10003
(646) 937-0368
bradley.jenkins@asylumadvocacy.org
anne.recinos@asylumadvocacy.org
zachary.manfredi@asylumadvocacy.org

*Counsel for Plaintiffs*
*\* Appearing pursuant to D.N.M.LR-Civ.
83.3(a).*

**CERTIFICATE OF SERVICE**

I certify that on March 18, 2022, I filed the foregoing document electronically through the CM/ECF system, which caused all parties or counsel of record to be served by electronic means.

*/s/Leon Howard*

Leon Howard