**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

**A.E.S.E., a minor child, and Eusebio Daniel**
**Sabillon Paz, her father,**

   **Plaintiffs,**

**v.**                                              **No. 21-cv-0569 RB-GBW**

**United States of America and**
**Management & Training Corporation,**

   **Defendants.**

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiffs Eusebio Daniel Sabillon Paz (Paz) and A.E.S.E., Paz's then seven-year-old daughter, crossed the border from Mexico to the United States in 2018 seeking asylum.[1] Rather than finding protection and support, Paz and A.E.S.E. were subjected to cruel and inhumane treatment from federal and state agents and officials operating under the federal "zero-tolerance" policy in effect at that time. Paz and A.E.S.E. were forcibly separated pursuant to this policy.

The Government charged Paz with illegal entry under 8 U.S.C. § 1325 and transferred him to a West Texas federal prison. It later dismissed the charge and transported Paz to a New Mexico Immigration and Customs Enforcement (ICE) detention facility. Paz was mistreated and medically neglected in both facilities. A.E.S.E. was transferred first to the Clint Border Facility where she suffered sexual assault and severe emotional distress, and later to a substandard, federally funded youth facility in California. Plaintiffs were reunited after 50 days when the government decided that Paz passed the "Credible Fear Interview."

Both continue to suffer emotional and physical consequences from their separation and

---

[1] The Court recites the facts as they are derived from Plaintiffs' Complaint and accepts them as true for purposes of this motion.

1

detention. Plaintiffs now bring suit under federal and state law. Before the Court are two motions: Management and Training Corporation's Motion to Sever (Doc. 28) and the United States' Motion to Transfer, or in the Alternative, Motion for Partial Dismissal for Lack of Subject Matter Jurisdiction (Doc. 31). The Court will deny the motion to sever, deny the motion to transfer, and deny in part the motion to dismiss as explained below.

## I.   Background

Plaintiffs crossed the border from Mexico to the United States on May 29, 2018, to escape political violence against their family motivated by Paz's activism efforts in Honduras. (Doc. 1 (Compl.) ¶¶ 2, 28.) Customs and Border Protection (CBP) officials took Plaintiffs to a processing center "commonly referred to by asylum seekers as an 'hielera' (an 'icebox,' in Spanish) because of the freezing cold temperatures." (*Id.* ¶ 34.) Plaintiffs stayed in a crowded, dirty cell with other families and endured callous treatment from the CBP officers. (*See id.* ¶¶ 35–41.) On May 31, 2018, Department of Homeland Security (DHS) officers took the families from the cell and forcibly separated the parents and children, including Plaintiffs. (*Id.* ¶¶ 42–43.) Plaintiffs allege that the Government separated them pursuant to the federal zero-tolerance policy. (*Id.* ¶ 20.) "Under this policy, the federal government criminally prosecuted asylum seekers who entered the United States between ports of entry" and "forcibly separated thousands of asylum-seeking families . . . ." (*Id.*) "The ostensible . . . purpose of the policy was to deter other families from exercising their lawful right to seek asylum in the United States." (*Id.* ¶ 23.)

On June 1, 2018, federal officers transferred Paz to a federal prison in West Texas. (*Id.* ¶ 46.) Paz was charged with improper entry by a noncitizen under 8 U.S.C. § 1325(a)(1). (*Id.* ¶ 47.) While in custody, federal agents refused to answer his questions about what happened to his daughter. (*Id.* ¶ 49.) Additionally, Paz began suffering from severe abdominal pain, headaches,

fever, and pain while urinating, and officers ignored his many requests for medical help. (*Id.* ¶ 51.) The federal charge was dismissed on June 21, 2018. (*Id.* ¶ 48.)

On June 22, 2018, federal officials transferred Paz to ICE custody at the Otero County Processing Center (OCPC) in Chaparral, New Mexico. (*Id.* ¶¶ 8, 52.) Defendant Management and Training Corporation (MTC) operates the facility.[2] (*Id.* ¶ 8.) MTC employees and federal government officials at OCPC subjected Paz to emotional distress and abuse by "leverag[ing his] separation from A.E.S.E. and his detention in an unlawful effort to coerce him into abandoning his asylum claim." (*Id.* ¶¶ 60, 65.) MTC employees "attempted to manipulate . . . Paz's evangelical Christian religious beliefs in an effort to coerce him into accepting deportation" by hosting religious services "in which the detention center's pastor told the detainees that . . . failing to sign their deportation papers was a sin." (*Id.* ¶ 69.) Additionally, Paz's health condition continued, and although an OCPC nurse diagnosed kidney stones, he received no medical treatment other than a single Tylenol to treat his excruciating pain and bloody urine. (*Id.* ¶¶ 74–78.)

After Plaintiffs were forcibly separated, employees with the Department of Health and Human Services' (HHS) Office of Refugee Resettlement (ORR) contacted Paz's parents (A.E.S.E.'s grandparents), who lived in Ohio. (*Id.* ¶¶ 17, 87.) They immediately responded and sought custody of A.E.S.E. (*Id.* ¶ 87.) They filed a Family Reunification Application, which "included a signed statement from A.E.S.E.'s mother requesting that her daughter be released into [their] custody." (*Id.* ¶ 88.) The government, without giving any reason, refused to release A.E.S.E. to her grandparents. (*Id.* ¶ 89.)

A.E.S.E. was taken first to the Clint Border Facility in Clint, Texas, where migrant

---

[2] Plaintiffs allege that "[t]he federal government contracts with the County of Otero, New Mexico pursuant to an intergovernmental service agreement, and the County of Otero in turn subcontracts with MTC." (Compl. ¶ 18.) "MTC is responsible for the daily operations of ICE detention at the [OCPC] . . . ." (*Id.*)

"children were held . . . in squalid conditions in overcrowded cells, without adequate water, food, places to sleep, or proper sanitation." (*Id.* ¶¶ 79–80.) At one point, A.E.S.E. was directed to shower with two other young girls. (*Id.* ¶ 82.) While in the shower, a female officer "began rubbing [A.E.S.E.'s] stomach" and "then attempted to touch A.E.S.E.'s vagina." (*Id.* ¶ 83.) When A.E.S.E. defended herself, the officer became angry and told A.E.S.E. that if she told anyone about the incident, "she would 'never see her parents again.'" (*Id.* ¶ 84.) The officer then sexually assaulted the two other girls in the shower. (*Id.* ¶ 85.)

In early June, A.E.S.E. was transported to the David & Margaret Youth and Family Services facility in California. (*Id.* ¶ 90.) This "facility is an ORR Contractor and a recipient of federal funding." (*Id.* ¶ 91.) A.E.S.E. stayed in a small, windowless room with one roommate and "was confined to her small room whenever she was not cleaning or attending classes." (*Id.* ¶ 93.) A.E.S.E. did not receive appropriate nutrition and sustained significant weight loss and other emotional and physical health conditions as a result of her detention at the facility. (*Id.* ¶¶ 96–102.)

In July 2018, "Paz was given a Credible Fear Interview ('CFI') as part of his asylum process." (*Id.* ¶ 72.) He was informed several days later that he passed the CFI, and "he was allowed to speak with A.E.S.E. for the first time since their forced separation." (*Id.* ¶¶ 72–73.) Plaintiffs were released from custody and reunited on July 19, 2018. (*Id.* ¶¶ 102–03.) The two continue to suffer from significant physical and emotional symptoms from their forced separation, detention, abuse, and medical neglect. (*See id.* ¶¶ 104–11.)

An immigration judge granted Paz and his immediate family asylum on August 21, 2019. (*Id.* ¶ 113.) Plaintiffs were domiciled in Texas at the time they filed this lawsuit. (*Id.* ¶ 16.) They bring claims against the United States under the Federal Tort Claims Act (FTCA) for intentional infliction of emotional distress (IIED), assault and battery, abuse of process, breach of fiduciary

duty, conversion, negligence, medical negligence, and negligent supervision. (*Id.* ¶¶ 141–83.) Paz brings claims against MTC under state law for IIED, assault and battery, negligence, medical negligence, and negligent supervision. (*Id.* at ¶¶ 184–209.)

MTC asks the Court to sever Paz's claims against MTC from Plaintiffs' claims against the United States pursuant to Federal Rule of Civil Procedure 21. (Doc. 28.) The United States moves to transfer this action to the Western District of Texas pursuant to 28 U.S.C. § 1404. (Doc. 31.) "'Section 1404(a) only authorizes the transfer of an entire action, not individual claims,' unless those claims are severed under [Rule] 21." *Roco, Inc. v. EOG Res., Inc.*, No. 14-1065-JAR-KMH, 2014 WL 5430251, at *6 (D. Kan. Oct. 24, 2014) (quoting *Chrysler Credit Corp. v. Country Chrysler, Inc.*, 928 F.2d 1509, 1518 (10th Cir. 1991)). Accordingly, the Court will take up MTC's motion first.

## II.     The Court will deny MTC's motion to sever.

### A.     Legal Standard for Motions to Sever

Under Rule 21, "the Court may 'add or drop a party . . . [or] sever any claim against a party' if that party has not been properly joined in the action." *Tarin v. RWI Const., Inc.*, No. CV 12-145 CG/LAM, 2012 WL 12354227, at *2 (D.N.M. July 13, 2012) (quoting Fed. R. Civ. P. 21). The Court has wide discretion in considering motions to sever. *Id.* at *3. "Such discretion, however, should be exercised only after the court is fully informed." *Id.*

In considering a motion under Rule 21, the Court looks to the joinder standards of Rule 20. *See Estrada v. McHugh*, No. CV 10-592 JCH/GBW, 2012 WL 13076247, at *2 (D.N.M. Oct. 19, 2012). "[C]laims are misjoined either when they do not arise out of the same transaction or occurrence, or series of transactions or occurrences, or when they do not involve a common question of law or fact." *Id.* (citing Fed. R. Civ. P. 20(a)(1)). "In order to ascertain if a particular

factual situation constitutes a transaction or occurrence for the purposes of Rule 20, courts consider whether a 'logical relationship' exists amongst and between the claims." *Id.* (quoting *Sheets v. CTS Wireless Components, Inc.*, 213 F. Supp. 2d 1279, 1286 (D.N.M. 2002)). "A logical relationship exists if there is some nucleus of operative facts or law." *Roco*, 2014 WL 5430251, at *6 (quotation omitted). The Court may also consider "the factors listed in Rule 42(b), which allows a court to order separate trials on separate claims." *Estrada*, 2012 WL 13076247, at *2 (citing *Mosley v. Gen. Motors Corp.*, 497 F.2d 1330, 1332 (8th Cir. 1974))). "These factors include convenience, potential prejudice to the parties, efficiency, and economy." *Id.* (citing Fed. R. Civ. P. 42(b)).

### B.    Plaintiffs' claims against Defendants are properly joined under Rule 20.

"Party joinder under rule 20(a) has only 'minimal requirements.'" *Ullman v. Safeway Ins. Co.*, 995 F. Supp. 2d 1196, 1247 (D.N.M. 2013) (quotation omitted).

> Such joinder only requires (i) that the claims by or against the party to be joined arise from the same transaction, occurrence, or series of transactions or occurrences underlying the claims by or against the party with which it seeks to join; and (ii) the claims by or against the party to be joined share at leas[t] one question of law or fact with the claims by or against the party with which it seeks to join.

*Id.* (quotation omitted). "[T]he 'transaction or occurrence prong is not amenable to a bright-line test . . . .'" *Id.* (quotation omitted). "[T]he key to interpreting the rule lies in understanding its twin goals: to limit the private and public costs of redundant litigation while being fair to those parties who must litigate their claims in a single claim." *Id.* (quotation omitted).

MTC argues that the claims here do not arise out of the same series of transactions or occurrences, because Paz's claims are distinct in time and location from those Plaintiffs bring together against the United States. (*See* Doc. 28 at 5.) Plaintiffs disagree and argue that this view of the claims "ignores [MTC's] contractual relationship with the Government and the multiple allegations in the Complaint that plainly allege connections and overlap between the Government's

and MTC's conduct in furtherance of the 'zero-tolerance' policy." (Doc. 42 at 14–15[3] (citing Compl. ¶¶ 8, 18–19, 52–78).) Plaintiffs cite *Estrada v. McHugh* and *Southern Poverty Law Center v. U.S. Department of Homeland Security* in support of their position.

In *Estrada*, two female employees brought allegations of discrimination against their employer. 2012 WL 13076247, at *1. The employer moved to sever and argued that "considering [the employees'] claims together would confuse the jury and prejudice [the employer]." *Id.* at *3. The court disagreed and found that "[a]lthough [the employees'] claims involve different dates, supervisors, and factual circumstances, they are logically related because they all fall within the broader allegation that [the employer's] policies and practices have a discriminatory impact on women." *Id.* at *2 (citation omitted). In *Southern Poverty Law Center*, a case that looked at "immigrants' access to counsel in three separate detention facilities[,]" the defendant facilities sought to sever the claims "into three separate cases corresponding to the respective facilities"— two in Georgia and one in Louisiana. Civ. No. 18-760 CKK, 2019 WL 2077120, at *1 (D.D.C. May 10, 2019). The court found that because the "difficulties accessing counsel at all three facilities allegedly stem from [the d]efendants' administration of national standards," the "[r]esolution of the legal and factual issues . . . turn on those national standards and [the d]efendants' enforcement of them." *Id.* at *2. The court also noted that splitting the claims "would unnecessarily multiply litigation . . . ." *Id.*

Here, Plaintiffs argue that there are factual overlaps—i.e., Paz experienced mistreatment "while being transported between federal and MTC facilities, as well as the physical and emotional abuse and medical neglect . . . at the hands of *both* Government officials and MTC employees while detained at [OCPC]." (Doc. 42 at 15 (citing Compl. ¶¶ 52–58, 60).) Plaintiffs note that the

---

[3] The Court cites the CM/ECF pagination on Plaintiffs' response briefs rather than the internal pagination. (Docs. 42; 43.)

allegations also "arise from the same transaction and occurrence in that they all stem from the Government's zero-tolerance policy and MTC's role in providing assistance to the Government in connection with that policy . . . ." (*Id.*)

"The purpose of Rule 20(a) is 'to promote trial convenience and expedite the final determination of disputes, thereby preventing multiple lawsuits.'" *Otte v. UMB Bank, N.A.*, No. 19-2351-CM-GEB, 2019 WL 6828652, at *2 (D. Kan. Dec. 13, 2019) (quotation omitted). "The Supreme Court has recognized that, under the Rules of Civil Procedure, 'joinder of claims, parties and remedies is strongly encouraged.'" *Id.* (quotation omitted). The Court finds that Defendants are properly joined, as the allegations link the treatment Paz was subjected to at both facilities and link the government's zero-tolerance policy with Defendants' roles in promoting that policy.

## C.    The Rule 42(b) factors support denying the motion at this time.

The Court finds that the Rule 42(b) factors—"convenience, potential prejudice to the parties, efficiency, and economy"—also weigh in support of keeping the claims together. *See Estrada*, 2012 WL 13076247, at *2 (citing Fed. R. Civ. P. 42(b)).

### 1.    Convenience

MTC argues that "[s]everance will not substantially inconvenience Plaintiffs" because they "can still pursue their claims against [the Defendants] in separate cases." (Doc. 28 at 6.) It also contends that "Plaintiffs get very minimal convenience from having the claims . . . heard together – because they are so distinct and based on entirely different facts." (*Id.* at 7.) Plaintiffs respond that there are issues that are more convenient to litigate together, particularly Paz's medical negligence claims, which will "present common questions about the quality of care he received before, during, and after his detention at" the facilities. (Doc. 42 at 17.) The same would be true of issues regarding damages based on those claims.

MTC argues that having separate trials would be more convenient for the parties and witnesses. (*See* Doc. 28 at 7.) This may be true for some, but not all witnesses. But more importantly, MTC notes that many of the events occurred in El Paso, Texas, which is within an hour's drive of the relevant courthouse in New Mexico. This bears little to no weight in the Court's consideration of convenience. In sum, this factor weighs in favor of denying severance.

### 2.    Prejudice

MTC argues that it will be prejudiced if the Court does not sever the claims, because "Plaintiffs have alleged salacious and politically charged allegations against the [United States]." (*Id.* at 6.) As Plaintiffs have also alleged that MTC was complicit in promoting the zero-tolerance policy, MTC cannot separate itself from these allegations entirely.

MTC also contends that it "will be prejudiced by having to present its evidence as to . . . Paz's kidney stones along with the [Government's] defenses to alleged sexual assault, improper sanitation at the border, and negligent mistreatment of . . . Paz before he was in MTC's care." (*Id.* at 6–7.) MTC cites *Tab Express International, Inc. v. Aviation Simulation Technology, Inc.*, 215 F.R.D. 621 (D. Kan. 2003), in support. In *Tab Express*, the plaintiff sued the defendant for breach of contract and related claims, and the defendant filed counterclaims for direct patent infringement. 215 F.R.D. at 622. "The parties agree[d] that [the] patent infringement claims [had] no factual or legal connection to [the] plaintiff's claims." *Id.* at 623. The court granted the plaintiff's motion to sever, finding that "the potential prejudice to plaintiff of defending [the] infringement claims in this forum far outweighs the prejudice to [the] defendant in severing and transferring its claims to a more convenient forum." *Id.* at 624. The court also noted that there would be "significant delay" in keeping the claims and counterclaims together, as the defendant proposed a delayed discovery process and adjudication of the claims to remedy any prejudice. *Id.* Unlike in *Tab Express*, the

Court has found that there are legal and factual connections between Plaintiffs' claims against Defendants.

The Court finds that any potential prejudice to MTC is not so great that severance is warranted. Should MTC continue to be concerned about prejudice due to factual allegation against the United States, the jury can be given an appropriate instruction. *See S.E.C. v. Woodruff*, 778 F. Supp. 2d 1073, 1098 (D. Colo. 2011) ("The Court is also confident that no prejudice will inure to either Defendant from being tried jointly with his co-Defendant, as the Court will carefully tailor its jury instructions and verdict forms to address any risk of improper spillover.").

### 3.     Efficiency and Economy

MTC argues that "there is no judicial economy in keeping these separate causes of action together" because the facts and legal theories are distinct. (Doc. 28 at 7–8.) The Court finds, however, that there is overlap in both the facts alleged and the legal theories proposed. At least at this early stage, the Court finds that keeping the claims together will lead to a more "prompt and efficient disposition of" the lawsuit. *See Tripoli Mgmt., LLC v. Waste Connections of Kan., Inc.*, No. 10-1062-SAC, 2011 WL 2897334, at *22 (D. Kan. July 18, 2011) (quoting *Tab Express*, 215 F.R.D. at 623).

The Court will deny MTC's motion at this time. Based on the factual allegations and legal theories asserted in the Complaint, the claims against Defendants stem from the same series of transactions or occurrences and keeping the claims together will serve the ends of justice and promote judicial economy. *See id.*

## III.    The Court will deny the United States' motion to transfer.

### A.     Legal Standard for Motions to Transfer

"For the convenience of parties and witnesses, in the interest of justice, a district court may

transfer any civil action to any other district or division where it might have been brought . . . ." 28 U.S.C. § 1404(a). "The party moving to transfer a case pursuant to § 1404(a) bears the burden of establishing that the existing forum is inconvenient." *Chrysler Credit Corp.*, 928 F.2d at 1515 (citations omitted). The Court may not "transfer a suit to a district which lacks personal jurisdiction over the defendants, even if they consent to suit there." *Id.* (citations omitted).

Section 1404(a) gives the Court discretion to decide "motions for transfer according to an 'individualized, case-by-case consideration of convenience and fairness.'" *Id.* at 1516 (quoting *Stewart Org. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988)).

> Among the factors [a district court] should consider is the plaintiff's choice of forum; the accessibility of witnesses and other sources of proof, including the availability of compulsory process to insure attendance of witnesses; the cost of making the necessary proof; questions as to the enforceability of a judgment if one is obtained; relative advantages and obstacles to a fair trial; difficulties that may arise from congested dockets; the possibility of the existence of questions arising in the area of conflict of laws; the advantage of having a local court determine questions of local law; and, all other considerations of a practical nature that make a trial easy, expeditious and economical.

*Id.* (quotation omitted). "In most cases, the Court should honor the Plaintiff's choice of forum, 'unless the balance in the defendant's favor is shown by clear and convincing evidence' that demonstrates the transfer serves the interest of justice and is more convenient for the parties and witnesses." *Tsosie v. United States*, No. 13-CV-132 JAP/LFG, 2013 WL 12136383, at *2 (D.N.M. July 17, 2013) (quoting *Emps. Mut. Cas. Co. v. Bartile Roofs, Inc.*, 618 F.3d 1153, 1168 n.13 (10th Cir. 2010)). "This 'interest of justice' factor includes the relative ease of access to sources of proof, the cost of obtaining attendance of witnesses, and all of the practical considerations that make the trial of the case easy, expeditious, and inexpensive." *Id.* at *6; *see also Navajo Health Found.- Sage Mem'l Hosp., Inc. v. Burwell*, 86 F. Supp. 3d 1211, 1237 (D.N.M. 2015) (noting that "[t]he 'interest of justice' is a separate element" and implicates factors such as docket congestion, likely

speed to trial, "each court's relative familiarity with the relevant law[,]" the "desirability of resolving controversies in each locale[,] and the relationship of each community to the controversy") (citations omitted).

### B.    The United States has not shown that the factors weigh in favor of transfer.

The United States has the burden to show that transfer is proper. *William A. Smith Contracting Co. v. Travelers Indem. Co.*, 467 F.2d 662, 664 (10th Cir. 1972). "Unless the balance is strongly in favor of the movant the plaintiff's choice of forum should rarely be disturbed." *Id.* Having considered the relevant factors, the Court will deny the motion to transfer.

### 1.    Plaintiff's Choice of Forum

"The plaintiff's choice of forum weighs against transfer." *Emps. Mut. Cas.*, 618 F.3d at 1167. This choice "receives less deference, however, if the plaintiff does not reside in the district." *Id.* at 1168 (citations omitted). Plaintiffs do not reside in New Mexico, and their choice of venue here is entitled to less deference.[4] Thus, this factor weighs only slightly in favor of Plaintiffs.

### 2.    Accessibility of Witnesses and Other Sources of Proof and the Cost of Making the Necessary Proof

Considering the second and third factors, the United States argues that there is "little concern that the parties will be deprived of access to witnesses or sources of proof if the case is moved to El Paso, Texas – a distance less than 30 miles from" the OCPC. (Doc. 31 at 17.) As Plaintiffs point out, however, this observation does not address the Government's burden as movant. (*See* Doc. 43 at 21.) The Tenth Circuit stated that "[t]o demonstrate inconvenience" in the accessibility of witnesses and evidence, "the movant must (1) identify the witnesses and their

---

[4] The United States asserts in its reply brief that "Plaintiffs have not established venue in" New Mexico. (Doc. 49 at 2.) The United States did not raise any argument in its motion about improper venue, and the Court declines to consider improper venue as a basis for dismissal now. *See Plotner v. AT&T Corp.*, 224 F.3d 1161, 1175 (10th Cir. 2000) (citing Tenth Circuit's "general rule that [courts] do not consider issues raised for the first time in a reply brief") (citation omitted).

locations; (2) indicate the quality or materiality of the[ir] testimony; and (3) show[] that any such witnesses were unwilling to come to trial . . . [,] that deposition testimony would be unsatisfactory[,] or that the use of compulsory process would be necessary." *Emp'rs Mut. Cas.*, 618 F.3d at 1169 (quotation marks and citations omitted). The United States maintains that it would not be inconvenient *to transfer* the lawsuit to the Western District of Texas, but its burden is to specifically demonstrate why it would be inconvenient *to keep* it in New Mexico. As the El Paso division of the Western District of Texas is less than an hour drive from this courthouse, the Government would be hard-pressed to mount an effective argument here. These two factors weigh against transfer.

### 3.    Remaining Factors

The Government gives short shrift to the remaining factors, and the Court agrees that none weigh heavily against or in favor of transfer. As Plaintiffs note, claims under the FTCA will be heard by a bench trial, so there are no factors at play related to a jury. The Court is confident that it can handle any claims that rely on Texas state law, particularly in light of the relatively simple state law legal issues presented in this matter. *See id.* at 1170. Moreover, because the Court denied MTC's motion to sever, a transfer would also mean that a Texas court may be faced with questions of New Mexico state law.[5] The Government raises no significant issue regarding how either court's caseload will impact transfer. In short, the remaining factors do not weigh in favor of transfer.

After analyzing the relevant factors, the Court finds that the Government's motion to transfer should be denied.

## IV.    Legal Standards Relevant to the Government's Motion to Dismiss

The United States moves to dismiss Plaintiffs' claims in Count I (IIED) and Count VI

---

[5] As the Court finds that transfer is not necessary under the factors outlined above, it is unnecessary to decide whether MTC is subject to personal jurisdiction in the Western District of Texas.

(negligence) for lack of subject matter jurisdiction. (*See* Doc. 31 at 2 n.1 & 3.) It asserts that "Congress has not waived the federal government's sovereign immunity for claims for money damages in these circumstances." (*Id.* at 3–4.)

### A.     Legal Standard for Motions to Dismiss under Rule 12(b)(1)

Federal Rule of Civil Procedure "12(b)(1) allows a party to raise, by motion, the defense of the court's 'lack of jurisdiction over the subject matter.'" *Gonzagowski v. United States*, 495 F. Supp. 3d 1048, 1085 (D.N.M. 2020) (quoting Fed. R. Civ. P. 12(b)(1)). "A plaintiff generally bears the burden of demonstrating the court's jurisdiction to hear his or her claims." *Id.* (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 104 (1998)).

"A Rule 12(b)(1) challenge to subject matter jurisdiction can be either facial or factual." *Ratheal v. United States*, No. 20-4099, 2021 WL 3619902, at *3 (10th Cir. Aug. 16, 2021), *cert. denied*, 142 S. Ct. 772 (2022), *reh'g denied*, 42 S. Ct. 1195 (2022) (citing *Holt v. United States*, 46 F.3d 1000, 1002 (10th Cir. 1995)). "A facial attack 'questions the sufficiency of the complaint,' and when 'reviewing a facial attack on the complaint, a district court must accept the allegations in the complaint as true.'" *Id.* (quoting *Holt*, 46 F.3d at 1002). "A factual attack goes beyond allegations in the complaint and challenges the facts on which subject matter jurisdiction depends." *Id.* (citing *Holt*, 46 F.3d at 1003). "When reviewing a factual attack, a court 'may not presume the truthfulness of the complaint's factual allegations,' and may consider affidavits and other documents to resolve disputed jurisdictional facts under Rule 12(b)(1) without converting the motion to a summary judgment motion." *Id.* (quoting *Holt*, 46 F.3d at 1003).

If the Court must resolve an aspect of Plaintiffs' substantive claim in order to assess the applicability of the discretionary function exception, then it must convert the motion to dismiss to one for summary judgment. *See id.* Here, the Court may "answer[] the jurisdictional question as a

matter of law, without resolving any factual disputes or substantive aspects of [Plaintiffs'] claims." *See id.* Accordingly, the Court will consider the allegations in the Complaint to be true and will resolve the issue as a motion to dismiss. *See id.*; *see also Harter v. United States*, 344 F. Supp. 3d 1269, 1275 (D. Kan. 2018).

### B.     Law Regarding the FTCA

"The concept of sovereign immunity means that the United States cannot be sued without its consent." *Iowa Tribe of Kan. & Neb. v. Salazar*, 607 F.3d 1225, 1232 (10th Cir. 2010) (quotation omitted). "The FTCA provides a limited waiver of sovereign immunity." *Ball v. United States*, 967 F.3d 1072, 1075 (10th Cir. 2020). "It allows private parties to bring civil suits against the United States for personal injury or death caused by the negligence or wrongful conduct of government employees within the scope of employment." *Id.* (citing 28 U.S.C. § 1346(b)(1); *Kiehn v. United States*, 984 F.2d 1100, 1102 (10th Cir. 1993)). "The United States can be held liable only 'under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.'" *Id.* (citing 28 U.S.C. § 1346(b)(1)).

"There are also several statutory exceptions to the waiver of sovereign immunity." *Id.* "When an exception applies, sovereign immunity remains, and federal courts lack jurisdiction." *Garling v. U.S. EPA*, 849 F.3d 1289, 1294 (10th Cir. 2017) (citations omitted). "Waivers of sovereign immunity are to be read narrowly." *James v. United States*, 970 F.2d 750, 753 (10th Cir. 1992) (citations omitted). "The party bringing suit against the United States bears the burden of proving that sovereign immunity has been waived." *Id.* (citing *McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 188 (1936)).

The United States contends that Plaintiffs' FTCA claims are precluded by the discretionary

function exception, the due care exemption, and the private person analogue. The Court will discuss each exception in turn below.

## V.     The discretionary function exception does not bar the claims.

### A.     Law Regarding the Discretionary Function Exception

The FTCA bars claims against the United States "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.'" *Ball*, 967 F.3d at 1075–76 (quoting 28 U.S.C. § 2680(a)). Congress's purpose behind this exception was "to prevent the judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *Id.* at 1076 (quoting *Berkovitz v. United States*, 486 U.S. 531, 536–37 (1988)). "The exception 'marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals.'" *Id.* (quoting *United States v. Varig Airlines*, 467 U.S. 797, 808 (1984)).

In analyzing whether the exception applies to bar a claim, the Court uses "the two-part test set out by the Supreme Court in *Berkovitz*." *See id.* At the first step, the Court must "determine whether the challenged conduct 'involves an element of judgment or choice . . . .'" *Id.* (quotation omitted). If it does, then the conduct "is discretionary and falls within the language of the exception . . . ." *Id.* (quotation omitted). On the other hand, if "it involves 'a federal statute, regulation, or policy that specifically prescribes a course of action for an employee to follow,'" then "the exception does not apply" to bar the claim. *Id.* (quotation omitted).

"If the conduct was discretionary, [the Court] move[s] to the second step and ask[s] 'whether that judgment is the kind that the discretionary function exception was designed to

shield.'" *Id.* (quoting *Kiehn*, 984 F.2d at 1103). Discretionary decisions that are "grounded in the social, economic, or political goals of the [governing] statute and regulations are protected." *Id.* (quoting *United States v. Gaubert*, 499 U.S. 315, 323 (1991)). In other words, "if the conduct 'implicates the exercise of a policy judgment of a social, economic, or political nature,' the discretionary-function exception shields the government from liability." *Id.* (quoting *Duke v. Dep't of Agric.*, 131 F.3d 1407, 1411 (10th Cir. 1997)).

### B.     Plaintiffs' IIED and Negligence Claims

Plaintiffs acknowledge that the United States had discretion to detain Plaintiffs under 8 U.S.C. §§ 1225 or 1226(a), to prosecute Paz under 8 U.S.C. § 1325(a)(1), to house Paz pending possible removal proceedings under 8 U.S.C. § 1231(g)(1), and to determine that A.E.S.E. was an unaccompanied minor under the Trafficking Victims Protection Reauthorization Act of 2008. (*See* Docs. 31 at 4–5, 22–27; 43 at 26; 49 at 6–7.) Plaintiffs base their claims instead on purportedly nondiscretionary decisions government officials made under a variety of legal obligations. (*See* Compl. ¶¶ 115–40.) As discussed in their response brief, the obligations relevant to their IIED and negligence claims include: (1) the *Flores* Settlement Agreement, which arose out of class action litigation and is binding on the United States. (Compl. ¶ 115 (citing *Flores v. Sessions*, 862 F.3d 863, 869 (9th Cir. 2017)).) *See* Settlement Agreement, *Flores v. Reno*, No. CV 85-4544-RJK (Px) [hereinafter *Flores* Agreement], available at ACLU, https://www.aclu.org/legal-document/flores-v-meese-stipulated-settlement-agreement-plus-extension-settlement (last visited Sept. 15, 2022). The *Flores* Agreement imposes certain standards regarding minor children held in immigration detention. (*See* Doc. 43 at 28 (citing Compl. ¶¶ 115–22).); (2) Several sections of the CBP's National Standards on Transport, Escort, Detention and Search, which "sets forth . . . nationwide standards which govern CBP's interaction with detained individuals." U.S. Customs & Border

Prot., Nat'l Standards on Transport, Escort, Detention, & Search [hereinafter TEDS Standards] (2015), at *3, available at https://www.cbp.gov/sites/default/files/assets/documents/2020-Feb/cbp-teds-policy-october2015.pdf (Oct. 2015). (*See* Doc. 43 at 28 (citing ¶¶ 124, 128–29).); and (3) the Fifth Amendment's Substantive Due Process clause. (*Id.* at 29–33; Compl. ¶¶ 134–36.)

Plaintiffs base the IIED claim on allegations that government officials, in violation of Plaintiffs' substantive due process rights, threatened, taunted, separated, and purposefully withheld contact between Plaintiffs and withheld medical treatment from Paz in an effort to torment and traumatize them and to coerce Paz into giving up his claim for asylum. (*See generally* Compl.; Doc. 43 at 43.) Plaintiffs generally allege that the Government negligently breached duties of care it owed to them by providing inadequate care and custody during detention and by failing to comply with certain standards regarding A.E.S.E.'s detention and release. (*See* Compl. ¶¶ 168–69; Doc. 43 at 28–29.)

### C.    Application of *Berkovitz* Prong One

At the first step of the analysis, the Court "consider[s] whether the action is a matter of choice for the acting employee.'" *Gonzagowski*, 495 F. Supp. 3d at 1131 (quoting *Berkovitz*, 486 U.S. at 536). Plaintiffs argue that the *Flores* Agreement and TEDS Standards left government officials "no room for choice" due to "mandatory language that specifically prescribes a course of action." (Doc. 43 at 28 (quoting *Gallegos v. United States*, No. CV 08-0014 RB/LFG, 2009 WL 10664932, at *4–5 (D.N.M. Feb. 26, 2009)) (quotation marks omitted).) The Court will examine the relevant provisions as they relate to the two claims.

1. *Flores* Agreement ¶ 12(A) and TEDS Standards relevant to conditions of confinement.

"Facilities [that house minors] will provide access to toilets and sinks, drinking water and food as appropriate, . . . adequate temperature control and ventilation, adequate supervision to

protect minors from others, and contact with family members who were arrested with the minor." *Flores* Agreement ¶ 12(A). (*See also* Compl. ¶ 121.) Plaintiffs assert that the United States has no discretion to provide these basic requirements under ¶ 12(A). (Doc. 43 at 28–29.)

The Government contends that "conditions of confinement" claims are barred "because the manner in which the government manages and operates its detention facilities involves discretionary decisions susceptible to policy considerations." (Doc. 31 at 27 (citations omitted).) The Court agrees with the Government on one point—there is no minimal amount of contact with family members required, thus the decision of how much contact to allow is within the Government's discretion. The Court will examine that decision at step two.

Otherwise, the TEDS Standards set forth explicit minimal requirements regarding the conditions under which detainees may be held. The Complaint alleges that Plaintiffs were deprived of many such minimal necessities. For example, they were held in a "dirty, unhygienic cell" and were not able to shower or brush their teeth in contravention of TEDS Standards §§ 4.6, 4.7, 4.11, and 5.6, which provide that facilities "must be regularly and professionally cleaned and sanitized" and that "[d]etainees must be provided with basic personal hygiene items." (*See* Compl. ¶¶ 35–38.) Plaintiffs received inadequate food, at times only one meal (a cold burrito and juice box) per day and were told "to drink from the dirty faucet in [the] cell's unsanitary bathroom." (*Id.* ¶¶ 38–40.) TEDS Standards §§ 4.13, 4.14, and 5.6, however, require facilities to always have clean drinking water and clean cups available as well as snacks and regularly scheduled mealtimes, with at least two meals served hot to juvenile detainees. Plaintiffs were subjected to freezing temperatures with no blankets, contrary to TEDS Standards §§ 4.7, 4.12, and 5.6, which require juvenile detainees be provided with clean bedding and prohibit officers from "us[ing] temperature controls in a punitive manner." (*See* Compl. ¶¶ 34–36.) Finally, Plaintiffs were kept in a crowded

cell with unrelated adults and children. (Compl. ¶¶ 35–36.) TEDS Standards §§ 4.3 and 4.7 prescribe capacity limits and prohibit facilities from housing minors with unrelated adult detainees.

It was not within the officers' discretion to deny Plaintiffs these basic requirements in light of the TEDS Standards and the *Flores* Agreement. As the Court finds these provisions gave the officials "no room . . . to exercise policy judgment in" affording Plaintiffs basic necessities, "the discretionary function exception will not bar" Plaintiffs' claim based on this conduct and the Court need not examine the decisions under the second prong. *See Johnson v. U.S., Dep't of Interior*, 949 F.2d 332, 336 (10th Cir. 1991) (quotation marks and citation omitted); *cf. Ruiz ex rel. E.R. v. United States*, No. 13-cv-1241 KAM SMG, 2014 WL 4662241, at *8 (E.D.N.Y. Sept. 18, 2014) ("even if the binding guidance set by the *Flores* Agreement and the CBP's internal policies did not apply . . . , or permitted the CBP Officers to exercise discretion, the court would still find that under the second prong of the discretionary function test," the decision to deny a minor basic necessities would not "be susceptible to policy analysis").

2. *Flores* Agreement ¶¶ 14, 18, 8 C.F.R. § 236.3, and TEDS Standards relevant to detention length and family unity.

TEDS Standards § 1.9 and 5.6 and 8 C.F.R. § 236.3 provide that the policy of DHS and CBP is "to maintain family unity[,]" while the *Flores* Agreement places time limits on how long minors may be held in immigration detention. *See, e.g.*, *Flores* Agreement ¶ 12(A). (*See also* Compl. ¶ 117 (citing *Flores v. Lynch*, 212 F. Supp. 3d 907, 913–14 (C.D. Cal. 2015), *aff'd in part, rev'd in part, & remanded*, 828 F.3d 898 (9th Cir. 2016); *J.P. v. Sessions*, No. LA CV-18-06081-JAK-SKX, 2019 WL 6723686, at *6 (C.D. Cal. Nov. 5, 2019)).) The *Flores* Agreement also spells out policy on whom minor detainees should be placed with.

> Where the INS determines that the detention of the minor is not required either to secure his or her timely appearance . . . , or to ensure the minor's safety or that of others, the INS shall release a minor from its custody without unnecessary delay,

in the following order of preference, to:

| | |
|---|---|
| A. | a parent; |
| B. | a legal guardian; |
| C. | an adult relative (brother, sister, aunt, uncle, or grandparent); |
| D. | an adult individual or entity designated by the parent . . . ; |
| E. | a licensed program willing to accept legal custody; or |
| F. | an adult individual or entity seeking custody, . . . when it appears that there is no other likely alternative to long term detention and family reunification does not appear to be a reasonable possibility. |

*Flores* Agreement ¶ 14. "Upon taking a minor into custody, the INS, or the licensed program in which the minor is placed, shall make and record the prompt and continuous efforts on its part toward family reunification and the release of the minor pursuant to Paragraph 14 . . . ." *Id.* ¶ 18.

The Government argues that each of these requirements affords it discretion: First, the Agreement does not define "unnecessary delay." (Doc. 49 at 7.) The Ninth Circuit has interpreted this provision as "commit[ting] some definition of 'necessary' to the judgment of the agent in the field[,]'" thus, it is subject to the discretionary function exception. (*Id.* (quoting *Conrad v. United States*, 447 F.3d 760, 765 (9th Cir. 2006)).) The Government contends that the phrase "prompt and continuous efforts . . . toward family reunification" affords government officials discretion because it "does not explain exactly what those efforts must entail . . . ." (*Id.* (citing *Flores* Agreement ¶ 18).) The time limits are subject to exceptions, vesting the Government with some discretion. *See Flores* Agreement ¶ 12(A) (providing that minors should be transferred within either three or five days depending on the circumstances and subject to exceptions); *Flores*, 212 F. Supp. 3d at 913–14. And finally, the list of preferred individuals to whom minors should be released is not mandatory, but rather gives the government official discretion within certain guidelines. The Court agrees that these issues involve discretion and will look at them at the second prong.

   3.  TEDS Standards relevant to humane treatment.

Sections 1.2 and 5.1 of the TEDS Standards require that "CBP employees must speak and

act with the utmost integrity and professionalism." Section 1.4 states that "CBP employees must treat all individuals with dignity and respect" and "in a non-discriminatory manner . . . ." Yet, the Complaint alleges multiple instances of degrading and discriminatory treatment of Plaintiffs. (*See, e.g.*, Compl. ¶¶ 38, 41–42, 49.) TEDS Standards §§ 1.3 and 6.0 relate to a zero-tolerance policy for sexual abuse and the prohibition against retaliation by CBP staff. The federal officer's sexual assault on A.E.S.E. and threats of retaliation if A.E.S.E. disclosed the abuse were in direct contradiction of these standards. (*See* Compl. ¶¶ 82–86.)

The Government makes no argument that this language vests discretion in officials, and the Court finds that any claim based on these sections is not subject to the discretionary function exception.

### D.    Application of *Berkovitz* Prong Two

The Court must next determine whether the decisions at issue were "based on considerations of public policy." *Kiehn*, 984 F.2d at 1103 (quoting *Berkovitz*, 486 U.S. at 537). It is Plaintiffs' burden to show that the government's conduct was *not* grounded in policy. *Ball*, 967 F.3d at 1079.

Regarding the decision to deny contact between Plaintiffs, the Government contends that this decision related to policy regarding how the government manages detention facilities. (Doc. 31 at 27.) Plaintiffs disagree that this policy consideration excuses the decision to refuse Plaintiffs contact for a month. (Doc. 43 at 29.) They cite *Ruiz* in support. (*Id.*) In that case, CBP officers detained a four-year-old minor and her grandfather at an airport. 2014 WL 4662241, at *1–2. The agents failed to contact the minor's parents for 14 hours, despite her grandfather's repeated requests. *See id.* at *2. The court found that this decision was not subject to the discretionary function exception because there was no "discernible social, economic, or political policy

considerations in the regulatory or statutory regime that would explain" why officials did not contact the child's parents. *See id.* at *6.

Here, "A.E.S.E. was not permitted to speak with . . . Paz . . . at all from their initial separation . . . until [he] passed his CFI approximately one month later." (Compl. ¶ 99.) Yet the *Flores* Agreement mandates that minors are to have "contact with family members who were arrested with the minor." ¶ 12. As in *Ruiz*, the Court is hard-pressed to find how a policy grounded in the management of facilities justifies the refusal to allow Plaintiffs to communicate for a month. The Court finds that Plaintiffs have met their burden at this juncture to show, by a preponderance of the evidence, that the discretionary function exception does not apply to bar claims based on this decision. *United States ex rel. Hafter D.O.v. Spectrum Emergency Care, Inc.*, 190 F.3d 1156, 1160 (10th Cir. 1999) ("If jurisdiction is challenged, the burden is on the party claiming jurisdiction to show it by a preponderance of the evidence.") (citation omitted).

The remaining decisions all concern the timing of A.E.S.E.'s release and the Government's efforts to reunify her with a family member. The Government asserts that "[w]hether a parent is 'available to provide care and physical custody' is a policy question vested in federal officials." (Doc. 31 at 26 (quoting *D.B. v. Poston*, 119 F. Supp. 3d 472, 482–83 (E.D. Va. 2015)) (subsequent citations omitted).) Plaintiffs do not dispute that the United States has discretion to make such determinations. (Doc. 43 at 26.) Rather, they assert that the Government has a "duty to 'make and record prompt and continuous efforts on its part toward [her] release . . . .'" (*Id.* at 29 (quoting *Flores v. Rosen*, 984 F.3d 720, 728 (9th Cir. 2020)).)

The *Ruiz* case provides guidance. (Doc. 43 at 29.) Again, the CBP officials in that case detained a four-year-old minor who flew into the United States from Guatemala with her grandfather. *Id.* at *2. Once the agents contacted the minor's parents after the 14-hour delay, the

agents refused to put the minor on a plane to meet her parents in the United States, but instead coerced the father into agreeing to return the minor to Guatemala with her grandfather. *Id.* at *3. The court found that the agents' decision to "refus[e] to reunite a verified U.S. minor citizen with her biological and legal parents" did not relate to any policy considerations. *Id.* at *6, 9. Here, accepting the facts in the Complaint as true, A.E.S.E. was detained for over a month even though she had relatives advocating for custody with her mother's permission. Further, there is no allegation that officials made *any* effort to place A.E.S.E. with her grandparents, much less "prompt and continuous efforts." In the end, the Court finds Plaintiffs have met their burden to show that the decision to retain A.E.S.E. in detention is unrelated to relevant policy considerations and will deny the motion to dismiss on this basis.

Based on the allegations in the Complaint, the Court finds that Plaintiffs have shown that the complained-of conduct does not "implicate[] the exercise of a policy judgment of a social, economic, or political nature,'" and the United States may not avoid liability based on the discretionary-function exception. *See Ball*, 967 F.3d at 1076 (quotation omitted). Because Plaintiffs' claims are not barred by the discretionary function exception based on the *Flores* Agreement and TEDS Standards, the Court declines to analyze whether they would be allowed based on alleged constitutional violations.[6]

## VI.    The due care exemption does not bar the claims.

The United States contends that "Plaintiffs' claims relating to the decision to transfer" A.E.S.E. to ORR custody are precluded by the FTCA's due care exemption. (Doc. 31 at 32.) The FTCA bars suits against the United States for "[a]ny claim based upon an act or omission of an

---

[6] There is a circuit split on the issue of whether unconstitutional conduct can be "discretionary." *See, e.g.*, *Shivers v. United States*, 1 F.4th 924, 933 (11th Cir. 2021), *cert. denied*, 142 S. Ct. 1361 (2022). The Tenth Circuit has not spoken on the issue. *See Martinez v. United States*, 822 F. App'x 671, 676 (10th Cir. 2020). Because the Court will deny the motion on other grounds, it need not wade into the issue here.

employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid . . . ." 28 U.S.C. § 2680(a). Courts refer to this clause as the "due care exemption to the FTCA." *Welch v. United States*, 409 F.3d 646, 650 (4th Cir. 2005).[7] "To determine whether the due care exception bars a particular claim, [the Court employs] a two-part analysis." *Id.* (citation omitted). "First, [the Court] determine[s] whether the statute or regulation in question specifically pr[e]scribes a course of action for an officer to follow." *Id.* (citation omitted). "Second, if a specific action is mandated, [the Court] inquire[s] as to whether the officer exercised due care in following the dictates of that statute or regulation." *Id.* "If due care was exercised, sovereign immunity has not been waived." *Id.* (citation omitted).

Here, the Government contends that it was *required* to transfer custody of A.E.S.E under 8 U.S.C. § 1232(b)(3). (Doc. 31 at 32–33.) That statute provides that the United States is required to transfer custody of unaccompanied immigrant children to HHS within 72 hours of making the determination that the child is unaccompanied. § 1232(b)(3). Thus, the Government contends, once it determined that Paz was unable to care for A.E.S.E. due to his pending misdemeanor charge under § 1325, it was required to transfer custody of A.E.S.E. within 72 hours. (*See id.*)

Plaintiffs argue that § 1232(b)(3) merely establishes a deadline for transfer, it does *not* require the Government to separate minor children from the parents. (Doc. 43 at 43.) Thus, Plaintiffs argue, the Government was not "executing" this provision when it made the decision to separate the two. (*See id.*) The plaintiff in *A.F.P. v. United States* made the same argument. No. 1:21-CV-00780-DAD-EPG, 2022 WL 2704570, at *15 (E.D. Cal. July 12, 2022). The circumstances in *A.F.P.* were as follows: plaintiffs A.F.P. and his son, J.F.C. crossed into the United States to seek asylum. *Id.* at *1. CBP agents forcibly separated the two and detained them

---

[7] As neither party cites Tenth Circuit authority on point, the Court will use the test set out by the Fourth Circuit in *Welch*.

in an hielera. *Id.* A.F.P. was charged with illegal entry under § 1325, pled guilty, and was sentenced

to time served. *Id.* During the "court hearing on his illegal entry charge, CBP and ICE officers

designated J.F.C. as an unaccompanied minor" and transferred custody to the ORR, who sent the

minor to a facility in New York. *Id.* A.F.P. did not learn of the transfer destination and the father

and son "did not see each other again for [15] months." *Id.*

The court, in looking at the first step of the analysis, found that the due care exception

applies only when the conduct is "*required*, not merely authorized, by a statute or regulation." *Id.*

at *15 (citing *Welch*, 409 F.3d at 652). Because no "statute or regulation mandat[ed] the separation

of [the p]laintiffs upon their entry into the country under the circumstances alleged in" that case,

the court found the due care exception did not apply. *Id.* (quotation marks and citations omitted).

The same is true here. The United States has cited no statute or regulation that *requires* forcible

separation and separate detention under the circumstances of this case. *See, e.g.*, 8 U.S.C. § 1226(a)

(providing that "an alien *may be* arrested and detained pending a decision on whether the alien is

to be removed from the United States") (emphasis added). Instead, "family separation was

established by executive policy—not by a statute or regulation—which is not covered by the due

care exception." *A.F.P.*, 2022 WL 2704570, at *15 (quoting *A.P.F. v. United States*, 492 F. Supp.

3d 989, 995–96 (D. Ariz. 2020) (holding that because "no statute or regulation requir[ed] the

detention of individuals who are 'amenable to prosecution' in facilities different from those who

are not 'amenable to prosecution,' or . . . requir[ed] the separation of [the p]laintiffs upon their

entry into the country[,]" the due care exception did not apply)).

Plaintiffs further argue that even if the Government acted under a statute or regulation

mandating separation, it fails at the second step of the analysis as it did not exercise "due care."

(Doc. 43 at 42–43.) "[D]ue care in the execution of a federal law implies at least some minimal

concern for the rights of others." *Myers & Myers, Inc. v. U.S. Postal Serv.*, 527 F.2d 1252, 1262 (2d Cir. 1975) (quotation marks and citation omitted). Plaintiffs contend that the federal officials did not exercise due care when they forcibly removed A.E.S.E. in a manner designed to provoke emotional distress, coerced Paz into giving up his asylum claim, refused to give Paz information about his daughter's whereabouts, and "needlessly prolonged [A.E.S.E.'s] detention by refusing to release her into the custody of her grandparents without explanation" (*See* Doc. 43 at 43 (citations omitted).) The Government does not respond to this argument. (*See* Doc. 49 at 13–14.) The Court agrees that the Plaintiffs have plausibly alleged that government officials did not use due care in these decisions and will deny the motion to dismiss on this basis.

## VII.   Law Regarding the Private Person Analogue

Finally, the United States very generally argues that the FTCA bars any claims under the "private-person analogue." (Doc. 31 at 34–35.) 28 U.S.C. § 1346(b)(1) restricts the waiver of sovereign immunity to "circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." *See also* 28 U.S.C. § 2674 (providing that the United States is liable "in the same manner and to the same extent as a private individual under like circumstances"). The Government contends here that "[b]ecause only the federal government has the authority to enforce federal criminal and immigration laws and make detention determinations, there is no private person analogue that would support a claim under the FTCA." (*Id.* at 34.)

It appears that Plaintiffs understand this argument relates only to their claim for IIED.[8] (*See* Doc. 43 at 44–46.) The parties agree that Texas law applies to any acts giving rise to an IIED claim

---

[8] The Court sides with Plaintiffs here. The Government's argument on this issue was brief (less than two pages) and general. (Doc. 31 at 34–35.) It asserts that the FTCA bars claims stemming from enforcing immigration laws, criminally prosecuting Paz, detaining Paz pursuant to the criminal charge, and placing A.E.S.E. in a facility as an unaccompanied minor, because these claims "have no private-person counterpart." (Doc. 31 at 34–35.) The Court

in that state. (Docs. 43 at 44; 49 at 15.) Plaintiffs cite two Texas child abduction cases to support

a finding that Texas law recognizes a claim for IIED "in situations where a child is separated from

their parents." (Doc. 43 at 44 (citing *Eberle v. Adams*, 73 S.W.3d 322 (Tex. App. 2001); *Silcott v.*

*Oglesby*, 721 S.W.2d 290 (Tex. 1986)).) The Government argues that Plaintiffs' IIED claim is

premised only on the theory "that the separation was unconstitutional[,] . . . [and] 'a private person

cannot violate the Constitution.'" (Doc. 49 at 15 (quoting *F.D.I.C. v. Meyer*, 510 U.S. 471, 478

(1994)).) The Court notes first that the United States did not raise this argument in its motion, and

Plaintiffs did not have an opportunity to respond to it. *See Plotner v. AT&T Corp.*, 224 F.3d 1161,

1175 (10th Cir. 2000) (citing Tenth Circuit's "general rule that we do not consider issues raised

for the first time in a reply brief") (citation omitted). Regardless, Plaintiffs base their IIED claim

on more than alleged unconstitutional conduct—they also based the claim on allegations that the

government officials' conduct was violative of the *Flores* Agreement and TEDS Standards. The

Court finds that Plaintiffs' IIED claim based on their forcible separation in Texas survives the

motion to dismiss.

The Government also asserts for the first time in its reply brief that Plaintiffs "cannot

bootstrap [A.E.S.E.'s] claims arising from ORR custody in California to her claims arising from

the separation in Texas." (Doc. 49 at 15.) Plaintiffs did not address California law, and the Court

presumes that their IIED claim is not premised on any conduct from A.E.S.E.'s time at the

California facility. Thus, to the extent Plaintiffs do bring an IIED claim for governmental conduct

in California, they fail to cite authority to show that it survives this challenge, and the Court will

grant the motion to dismiss on this basis.

---

understands that these actions all relate to Plaintiffs' claim of IIED, while the negligence claims relate more to
Plaintiffs' conditions of confinement. If the Government intended to assert that there is no private person analogue for
Plaintiffs' negligence claim, it failed to make that clear.

**VIII.   Conclusion**

The Court finds that Plaintiffs' allegations against MTC and the United States arise from the same transaction and occurrence, and the Rule 42(b) factors weigh in support of keeping the claims together. Accordingly, the Court will **DENY** MTC's Motion to Sever. (Doc. 28.)

The United States has not met its burden to establish that the existing forum is inconvenient, and the Court will **DENY** the Motion to Transfer. (Doc. 31.)

The Court will **DENY IN PART** the Government's Motion to Dismiss. (Doc. 31.) Plaintiffs have met their burden to show that the Court has subject matter jurisdiction to hear the claim for negligence and the claim for IIED to the extent it is based on federal officials' tortious conduct in Texas. The Court will **DISMISS** any claim for IIED to the extent it is based on tortious conduct in California.

**IT IS SO ORDERED.**

_____
ROBERT C. BRACK
SENIOR U.S. DISTRICT JUDGE